**Rev. Lloyd YAGGIE, Plaintiff,**

v.

**INDIANA–KENTUCKY SYNOD EVANGELICAL LUTHERAN CHURCH IN AMERICA, Defendant.**

**No. 93–0438–L(CS).**

United States District Court,
W.D. Kentucky,
Louisville Division.

June 10, 1994.

---

Philip C. Kimball, Louisville, KY, for plaintiff.

William A. Blodgett, Jr., Kathryn A. Quesenberry, Woodward, Hobson & Fulton, Louisville, KY, for defendant.

## MEMORANDUM OPINION

SIMPSON, District Judge.

This matter stands submitted on motion by defendant, Indiana–Kentucky Synod, to dismiss the complaint of plaintiff, Reverend Lloyd Yaggie ("Pastor Yaggie"), for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. Said motion is made pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the following reasons, we find plaintiff's complaint impermissibly requests this court to inquire into the inner ecclesias-

tic workings of the church when such inquiry is prohibited by the First and Fourteenth Amendments to the United States Constitution. Accordingly, this court lacks jurisdiction in this dispute, and defendant's motion is **GRANTED.**

## I

This action is one for common-law defamation resulting from a conflict within the Resurrection Lutheran Church. The relevant facts are not in dispute.

Pastor Yaggie, the minister at Resurrection Lutheran, claims he was defamed by two agents or employees of the defendant. The alleged defamatory comments arose during the course of defendant's attempts to reconcile recurring conflicts between Pastor Yaggie and his parishioners. The turmoil at Resurrection Lutheran, which began soon after Pastor Yaggie accepted a "call" to ministry in 1990, reached an apex in the spring of 1992. At that point the defendant was asked to intervene in helping the parties mend their differences. Unfortunately, the attempts at reconciliation triggered a string of events which eventually resulted in this lawsuit. Since the intervention of the defendant was taken at the request of Resurrection Lutheran's governing body, it is necessary to briefly discuss the government of the Lutheran Church.

## LUTHERAN CHURCH GOVERNMENT

Each Lutheran congregation is incorporated as a not-for-profit entity, governed by either a three or twelve member church council.[1] The church council can adopt a constitution and bylaws, including provisions for third-party intervention in the case of conflicts between minister and congregation.

Many Lutheran congregations, including Resurrection Lutheran, have a Mutual Ministry Committee, whose primary mission is to assist the minister and occasionally intervene in congregational disputes. Members of the Mutual Ministry Committee are appointed

---

1. Resurrection Lutheran employed a three-member church council consisting of a president, vice president and treasurer.

jointly by the minister and the president of the church council.

Nationally, congregations within a geographical area are grouped together into what is called a synod. Each synod is governed by a bishop, who oversees all congregations and clergy within the region. Resurrection Lutheran is part of the Indiana–Kentucky Synod, presided over by Bishop Ralph Kempski. Pastor Lowell Buss is one of four cleric-assistants to Bishop Kempski.

Each synod, in turn, is a member of the Evangelical Lutheran Church in America ("ELCA"). Similar to each congregation, each synod and the ELCA has its own constitution by which it is governed. All constitutions contain provisions for resolving internal disputes between minister and congregation.

### THE CONFLICT AT RESURRECTION LUTHERAN

The rift between Pastor Yaggie and his parishioners appeared to be based on communication problems and differences in management style. Whatever its cause, the difficulties grew in size and volume until the Church Council requested the intervention of Pastor Buss in the spring of 1992. The Council's request for aid in resolving the church dispute was pursuant to its adopted constitution and bylaws.

Pastor Buss subsequently attended a meeting of the Church Council to discuss options for reconciliation between Pastor Yaggie and Resurrection Lutheran's members. The Council voted to have Pastor Buss work with the Mutual Ministry Committee to "mediate" between the two parties.

Over the next several weeks, Pastor Buss and the Mutual Ministry Committee met with members of the congregation who were experiencing difficulties with Pastor Yaggie. Pastor Buss was given the responsibility of reporting to the Church Council on the content and progress of these meetings. In July of 1992, Pastor Buss presented to the Mutual Ministry Committee a draft of the report he proposed to submit to the Church Council. A single paragraph of that report is the subject of Pastor Yaggie's first defamation claim:

OBSERVATION: A significant number of members have experienced the Pastor as being "aloof;" as being "the Boss," as being dogmatic; as not being open to the persons who disagree or have different viewpoints, even to the point of feeling that they are dismissed from friendship; as not always hearing what the other person is trying to say; as having particular difficulty in appreciating women as equals; as one who talks negatively about persons to others (behind their backs), sometimes close to the point of breaking confidentiality.

Pastor Yaggie adamantly opposed the inclusion of this paragraph in the final report to the Church Council. At his request, the paragraph was deleted and the original draft was seen only by members of the Mutual Ministry Committee: Pastor and Mrs. Yaggie, Pastor and Mrs. Buss, Lou Komis, Scott Holcomb and Ed Dedman.

Following the failure of this first attempt at reconciliation, the Church Council decided to employ a second dispute resolution process provided for in the constitutions of the congregation, the synod, and the ELCA.

The constitutions provide that, upon request of the church council, the synod bishop can appoint an advisory committee made up of three outside individuals, who are not informed in advance of the issues. The advisory committee, consisting of two clergy and one layperson, is to investigate the church's difficulties and formulate recommendations for their resolution.

Resurrection Lutheran requested, and Bishop Kempski promptly appointed, a three-member Advisory Committee. Acting pursuant to church constitution, the Committee met with members of the congregation at twenty-minute intervals to assess the situation. The Committee then met with Bishop Kempski, Pastor Yaggie, and Mrs. Yaggie to discuss the meetings and make recommendations for action. Pastor Yaggie's second and third claims of defamation came as a result of the Advisory Committee report submitted to the church's congregation. In pertinent part, that report stated:

Since Pastor Lloyd Yaggie announced to the congregation on September 13 that he

had asked that he "be put up for call" and implied his subsequent acceptance of a call, the Advisory Committee recommends that his intention to resign be honored and that appropriate consultation for professional development and personal healing be offered at synod expense in order to facilitate the transition to a new ministry and ensure his future pastoral effectiveness.

Pastor Yaggie's second claim principally objects to this report containing the phrase "the Advisory Committee recommends that his [Yaggie's] intention to resign be honored...." Yaggie asserts this language is defamatory and inaccurate. He makes no other claims based purely upon the language of the Advisory Committee report.

Pastor Yaggie's third and final claim concerns a statement allegedly uttered by Bishop Kempski concerning the meaning of the report. Pastor Yaggie asserts that, when Bishop Kempski was asked about the Committee's recommendation "that appropriate consultation for professional development and personal healing be offered," he responded by saying, "It means Pastor Yaggie's going to Saint Barnabas for psychiatric treatment and evaluation." Pastor Yaggie claims this statement was repeated verbatim on the following three occasions: (1) at a 5:30 meeting between the Advisory Committee, Pastor Yaggie, and Mrs. Yaggie; (2) at a 6:30 Church Council meeting attended only by Council members; and (3) at a 7:30 congregational meeting in which church members, the Advisory Committee, Bishop Kempski, Pastor Yaggie, Mrs. Yaggie, and two close friends of the Yaggies were present.

Therein lies the basis for Pastor Yaggie's three defamation claims. The defendant now moves to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

## II

The Supreme Court mandated over a century ago that this court was not to delve into matters concerning the inner ecclesiastical workings of the church:

But it is a very difficult thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character,—a matter over which the civil courts exercise no jurisdiction,—a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them,—becomes the subject of its action. It may be said here, also, that no jurisdiction has been conferred on the tribunal to try the particular case before it, or that, in its judgment, it exceeds the powers conferred upon it or that the laws of the church do not authorize the particular form of proceeding adopted; and in a sense often used in the courts, all of those may be said to be questions of jurisdiction.

*Watson v. Jones,* 80 U.S. (13 Wall.) 679, 733, 20 L.Ed. 666 (1872).

Since the opinion in *Watson,* the Supreme Court has consistently refused to address church controversy. In *Serbian Eastern Orthodox Diocese, etc. v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), the Court cited *Watson* for the proposition that federal courts lack jurisdiction to investigate whether proceedings pursuant to internal regulations of the church were procedurally or substantively defective. *Id.* at 711, 96 S.Ct. at 2381. The *Serbian* Court declined to interfere with the decision of the Holy Synod of the Serbian Orthodox Church (Mother Church) to suspend and ultimately remove a bishop of the church. The Court held:

Consistently with the First and Fourteenth Amendments "civil courts do not inquire whether the relevant [hierarchical] church governing body has power under religious law [to decide such disputes].... Such a determination ... frequently necessitates the interpretation of ambiguous religious law and usage. To permit civil courts to probe deeply enough into the allocation of power within a [hierarchical] church so as to decide ... religious law [governing church polity] ... would violate the First Amendment in much the same manner as civil determination of religious doctrine."

*Id.* at 708–09, 96 S.Ct. at 2380 (quoting *Md. & Va. Churches v. Sharpsburg Church,* 396 U.S. 367, 369, 90 S.Ct. 499, 500, 24 L.Ed.2d 582 (1970) (Brennan J., concurring))

■ It is firmly established that in the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive. *Gonzalez v. Archbishop,* 280 U.S. 1, 16, 50 S.Ct. 5, 7–8, 74 L.Ed. 131 (1929). The general rule can thus be stated: Courts should be loath to assert jurisdiction over internal church disputes; its exceptions are rare. *Serbian,* 426 U.S. at 709–10, 96 S.Ct. at 2380–81; *Presbyterian Church v. Hull Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969).

■ This court recognizes that none of the above cited decisions involved a defamation action brought by a minister against the hierarchy of his church. The importance we glean from each opinion is the Court's extreme reluctance to interfere with the internal workings of the church. We are also cognizant of the fact that, in this case, the alleged defamatory statements do not express any religious principles or beliefs. However, the fact remains that this action is the result of a conflict confined within the Resurrection Lutheran Church, concerning the employment relationship of its minister, and addressed in accordance with the church constitution. As will be discussed, we find these circumstances dictate our lack of jurisdiction over the matter.

A minister's employment relationship is governed by ecclesiastical rule. *Lewis v. Seventh Day Adventists Lake Region Conf.,* 978 F.2d 940, 942 (6th Cir.1992). Civil court jurisdiction over a ministerial employment dispute is impermissible because such intervention would excessively inhibit religious liberty. *Id.* Only on rare occasions where there exists a compelling governmental interest in the regulation of publish health, safety, and general welfare have the courts interfered in ecclesiastical matters. *Simpson v. Wells Lamont Corporation,* 494 F.2d 490, 493 (5th Cir.1974).

Not only is the interaction between a church and its pastor an integral part of church government, but all matters touching this relationship are of ecclesiastical concern. *Id.* at 493–94. It makes no difference that the ecclesiastical dispute fails to touch on church or religious doctrine. *Id.* "Whose voice speaks for the church is *per se* a religious matter. We cannot imagine an area of inquiry less suited to a temporal court for decision; evaluation of the gifts and graces of a minister must be left to ecclesiastical institutions." *Minker v. Baltimore Annual Conf.,* 894 F.2d 1354, 1357 (D.C.Cir.1990). There is no exception to the bar against interfering with matters of church administration. *Id.*

At least two courts have addressed the question of whether to exercise federal jurisdiction over a defamation claim and both have declined to do so. In *Farley v. Wisconsin Evangelical Lutheran Synod,* 821 F.Supp. 1286 (D.Minn.1993), the pastor of a Lutheran church in Bakersfield, California brought a defamation action against the Wisconsin Evangelical Lutheran Synod ("WELS") after WELS allegedly published both oral and written defamatory statements about him during its attempt to remove him as pastor. The court rejected plaintiff's arguments "that resolution of his defamation claim would implicate no concern expressed in the First Amendment because an inquiry into the dispute requires no examination of church procedures or ecclesiastical decisions." *Id.* at 1290. Instead the court determined that resolution of the defamation claim would require the court to impermissibly review matters of religious concern. *Id.* A long list of authorities denying courts subject matter jurisdiction over internal church disputes mandated dismissal of the action. *Id.* at 1288–90.

More importantly, the Sixth Circuit also dismissed a defamation claim for lack of subject matter jurisdiction in *Hutchison v. Thomas,* 789 F.2d 392 (6th Cir.1986). In *Hutchison,* an ordained Methodist minister challenged his enforced retirement under church disciplinary rules. The named defendants were the Bishop of the Methodist Church and three of his subordinates, the

Judicial Council of the Church, the East Ohio Conference of the Church, and the Board of Ordained Ministry of the Conference. Among the causes of action asserted were claims for defamation, intentional infliction of emotional distress, and breach of contract.

The plaintiff in *Hutchison* complained of several hearings which were conducted concerning his ability to relate properly to his congregation. He alleged that throughout the proceedings the defendants misrepresented his church relationships and defamed him by declaring him "unappointable" due to recurring problems with local congregations. The Sixth Circuit unequivocally held that the courts could not constitutionally intervene in such a dispute:

> The Supreme Court of the United States has steadfastly upheld the First Amendment's command that secular authorities may not interfere with the internal ecclesiastical workings and disciplines of religious bodies, although there may be occasions when civil courts can resolve disputes over the disposition and use of church property.

*Id.* at 393.

The *Hutchison* court found that the plaintiff's claims related to his employment and status as a minister of the church. *Id.* at 396. The action therefore concerned internal church discipline, faith, and organization, all of which were governed by ecclesiastical rule, custom, or law. *Id.* The court quoted with approval the Fifth Circuit opinion in *Simpson:*

> This case involves the fundamental question of who will preach from the pulpit of the church, and who will occupy the church parsonage. The bare statement of the question should make obvious the lack of jurisdiction of a civil court. The answer to that question must come from the church.

*Id.* at 394 (quoting *Simpson,* 494 F.2d at 492).

Pastor Yaggie principally relies on *Marshall v. Munro,* Alaska, 845 P.2d 424 (1993), for the proposition that his defamation claims can proceed. In *Marshall,* the Supreme Court of Alaska reversed a lower court's dismissal of Reverend Marshall's defamation claim against a member of the church hierar-chy. The court noted that "[m]ost cases are consistent in concluding that employment disputes within churches are core ecclesiastical concerns outside the jurisdiction of civil courts." *Id.* at 427. However, it then found that the dispute did not concern plaintiff's qualifications as a pastor and asserting jurisdiction over the defamation claim was proper.

We choose not to follow the *Marshall* rationale. First, it appears to be internally inconsistent. Second, we cannot allow it to outweigh the substantial federal authority holding to the contrary. Pastor Yaggie cites us no federal cases in support of his position, and we have failed to find any on our own. This court declines to dismiss the lengthy list of federal precedent, including this circuit's *Hutchison* decision, in favor of plaintiff's state court citations.

The matters in this case concern the intimate relationship between a pastor and his congregation. In an attempt to resolve an inner church conflict, Lutheran leadership investigated congregational attitudes toward Pastor Yaggie. The investigation was done in accordance with the constitutional provisions of the church. The alleged defamatory statements were made in connection with the mediation process and strictly within the confines of the church.

There can be no doubt that the matters in this case concerned the minister's current and future employment relationship with the church. As such, they are matters of ecclesiastical concern, over which this court has no jurisdiction. Wisdom mandates that we refrain from dictating to a congregation that if they are unhappy with their religious leader they cannot freely speak their mind. In a mediation process between minister and congregation, all parties should be able to express their innermost feelings without fear of reprisal from the courts.

If we were to accept jurisdiction over such matters, it would require us to delve into the church constitution and its procedures for settling internal disputes. If truth were a defense to the defamation claim, we presumably could face inquiry into determination of the minister's effectiveness. Not only is this precisely what the First Amendment prohibits, but Supreme Court and Sixth Circuit

authority prohibit us from exercising such jurisdiction were we so inclined. Accordingly, defendant's motion to dismiss for lack of subject matter jurisdiction will be **GRANTED.**

An order in keeping with this memorandum opinion will be entered this date.

### *ORDER*

This matter having come before the court on the motion of defendant, Indiana–Kentucky Synod, to dismiss the complaint of plaintiff, Reverend Lloyd Yaggie, for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted, and the court having considered said motion and being otherwise sufficiently advised, **IT IS HEREBY ORDERED** that defendant's motion to dismiss for lack of subject matter jurisdiction is hereby **GRANTED.** Accordingly, defendant's motion to dismiss for failure to state a claim upon which relief can be granted is **DENIED AS MOOT.**

There being no just reason for delay in its entry, this is a final order.