**Morris B. HEARD, et al., Appellants,**

v.

**C. Phillip JOHNSON, Appellee.**

**No. 01–CV–471.**

District of Columbia Court of Appeals.

Argued Sept. 3, 2002.

Decided Nov. 21, 2002.

Norman R. Evans; and Deborah E. Kane, Lanham, MD, for appellant.

Clement T. Cooper, Washington, DC, for appellee.

Before GLICKMAN and WASHINGTON, Associate Judges, and NEWMAN, Senior Judge.

NEWMAN, Senior Judge:

The trustees of Mount Airy Baptist Church (Trustees) contend that they are entitled to the protections of the Free Exercise Clause of the First Amendment in defending against a claim of defamation that arose from the removal of their former pastor. We agree.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Facts*

Mount Airy Baptist Church (Mt. Airy or church) is a nonprofit religious corporation founded in 1893 and incorporated under the laws of the District of Columbia in 1901. In 1986, the church adopted a constitution and bylaws which vest governing authority in its congregation, thus explicitly making Mt. Airy a congregational church. Mt. Airy also adopted Hiscox's Principles and Practices for Baptist Churches (*Edward T. Hiscox, Principles and Practices for Baptist Churches*, 3d ed.1980 (originally published as *The New Directory for Baptist Churches*)) as its guide in matters of church discipline and procedure.

In July of 1994, Mt. Airy hired Rev. C. Phillip Johnson (the plaintiff in this case) to be its pastor, an arrangement that was formalized by a written contract. The termination clause of the contract required both that the church request Johnson's resignation prior to taking a vote to terminate his employment as pastor, and that a

vote to terminate would only be binding on Johnson if a two-thirds majority voted to remove.

By the end of 1997, the congregation was dissatisfied with Johnson's services and voted to terminate his status as pastor during a business meeting of the church. Johnson did not acknowledge this vote as binding, did not step down, and continued to preach from Mt. Airy's pulpit. The Trustees then filed suit on behalf of the church seeking an injunction prohibiting Johnson from entering the church. *Hollingsworth, et al. v. Johnson,* Case No. 98–CA–65 (D.C.Super.Ct. February 11,1998). The trial court found that because the congregation had not asked for Johnson's resignation before voting to discharge him, the attempted termination of Johnson's employment as Mt. Airy pastor had violated the termination clause of Johnson's contract. The court therefore declined to issue the injunction. *Id.*

The congregation held another business meeting on February 21, 1998. At this meeting, the congregation asked Johnson to resign, but he indicated he would not tender his resignation. The congregation then voted to end Johnson's services as pastor of Mt. Airy by a vote of 185 to 142. Because the majority did not reach the requisite two-thirds, Johnson continued as pastor of the church.

On April 18, 1998, the congregation met again, and this time voted to end Johnson's pastorship by a vote of 130 to 2. Johnson felt that the vote was invalid and declined to honor it. He continued to appear at the church on Sundays and preach. At this point, the difficulties and tensions surrounding Johnson's tenure at Mt. Airy[1] gave rise to physical altercations at the church. This, in turn, prompted the Trustees to lock the doors of the church in an effort to prevent further violence while the situation was being resolved.

Johnson then sued the Trustees claiming wrongful eviction, challenging his termination, and seeking an injunction preventing the Trustees from barring his access to the church. *Mt. Airy Baptist Church v. Hollingsworth,* Case No. 98–CA–4230 (D.C.Super.Ct. September 21, 1998) (dismissed on First Amendment grounds for lack of subject matter jurisdiction). By consent order, during the remaining pendency of the wrongful eviction case (July 2, 1998 to September 21, 1998), Johnson was permitted to preside over some services at the church. Throughout this period, Johnson continued to hold himself out as the pastor of Mt. Airy.

Sometime during September, before the conclusion of Johnson's wrongful eviction case, a group calling itself the "Coalition of Concerned Members" produced an eighty-five-page manual documenting the grievances against Johnson, the reasons for his dismissal as pastor, and the attempts the congregation had made to remove Johnson as pastor of Mt. Airy. This manual has become the sole remaining subject of the present case.

### B. *Procedure*

This case began when Johnson filed a complaint against the Trustees on February 18, 1999, alleging (1) defamation, (2)

---

1. The 1998 suit brought by the Trustees was the third law suit arising out of Johnson's leadership of Mt. Airy. In the first suit, a deacon of the church sued Johnson for failing to follow established church disciplinary procedures. *Handon v. Johnson,* Case No. 96–CA–2714 (D.C.Super. Ct. June 7, 1996) (dismissed on First Amendment grounds for lack of subject matter jurisdiction). The second suit was brought by another church official against Johnson for violating Mt. Airy's constitution and bylaws. *Hughes v. Johnson,* Case No. 96–CA–9739 (D.C.Super.Ct. February 2, 1997) (dismissed on First Amendment grounds for lack of subject matter jurisdiction).

invasion of privacy and distortion of likeness, (3) breach of employment contract, (4) intentional infliction of emotional distress, and (5) negligent infliction of emotional distress. *Johnson v. Heard,* Case No. 99–CA–1124 (D.C.Super.Ct.). The Trustees moved to dismiss as to all claims, and the trial court (J. Edwards) entered an order granting this motion in part. Specifically, the trial court dismissed in their entirety both the claim for breach of contract (finding a lack of subject matter jurisdiction based on First Amendment grounds), and the claim for negligent infliction of emotional distress (for failure to properly state a claim). *Id.,* Order Granting in Part Defendants' Motion to Dismiss, dated August 27, 1999. The trial judge allowed claims (1), (2), and (4) to continue as alternative theories of liability only for the alleged publication of the manual. *Id.*

The Trustees then filed another motion to dismiss, combined with an alternative motion for summary judgment, requesting that the remaining claims be dismissed under Super. Ct. Civ. R. 12(b) for either lack of subject matter jurisdiction based on First Amendment grounds, or failure to state a claim upon which relief could be granted, or, in the alternative, that summary judgment be granted to the Trustees under Super. Ct. Civ. R. 56. Johnson opposed the new motion to dismiss and filed a cross motion for summary judgment. In an order dated October 23, 2000, the trial court denied both the Trustees' motion to dismiss and/or for summary judgment and Johnson's cross motion for summary judgment. The Trustees then filed a motion for reconsideration, which was opposed by Johnson and subsequently denied by the trial court on March 29, 2001. The Trustees have now appealed the trial court's denial of their motion to

dismiss and/or for summary judgment. Johnson did not file a cross appeal.

## II. ANALYSIS

### A. *Jurisdiction*

As a threshold matter, we must consider whether we have jurisdiction to hear this interlocutory appeal. This court has jurisdiction to review all "final orders and judgments" of the Superior Court. D.C.Code § 11–721(a)(1) (2002). Any "lack of finality is a bar to appellate jurisdiction." *Dyer v. William S. Bergman & Assocs.,* 635 A.2d 1285, 1287 (D.C.1993). An order is final when it "dispose[s] of the whole case on its merits so that the court has nothing remaining to do but execute the judgment or decree already rendered." *Id.* (quoting *Trilon Plaza Co. v. Allstate Leasing Corp.,* 399 A.2d 34, 36 (D.C.1979) (internal citation omitted)). An order denying a motion to dismiss ordinarily does not meet this standard of finality[2] and usually is not immediately appealable.

The collateral order doctrine, however, provides a narrow exception to the finality requirement. *See Mitchell v. Forsyth,* 472 U.S. 511, 525, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); *United Methodist Church v. White,* 571 A.2d 790, 791–92 (D.C.1990). Under the collateral order doctrine, a decision "is appealable if it falls within that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Mitchell,* 472 U.S. at 524–25, 105 S.Ct. at 2814–15 (citing *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949)) (inter-

---

**2.** Nor is the denial of a motion to dismiss among the types of interlocutory orders listed as immediately appealable under D.C.Code § 11–721(a)(2)(A–C) and (a)(3).

nal quotations omitted). Put more simply, a ruling such as an order denying a motion to dismiss may be appealable if it has "a final and irreparable effect on the important rights of the parties." *Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith v. Beards,* 680 A.2d 419, 425 (D.C.1996) (internal quotation marks and citation omitted), *cert. denied,* 520 U.S. 1155, 117 S.Ct. 1335, 137 L.Ed.2d 494 (1997). A ruling on a motion to dismiss will qualify for immediate appellate review if it: (1) conclusively determines a disputed question of law; (2) resolves an important issue that stands completely separate from the merits of the case; and (3) is effectively unreviewable on appeal from a final judgment. *See Bible Way Church, supra,* 680 A.2d at 425–26.

■ An order denying a Rule 12(b)(1) motion that asserts an immunity from law suits is the type of ruling "commonly found to meet the requirements of the collateral order doctrine and thus be immediately appealable, so long as the ruling turns on an issue of law rather than on a factual dispute." *Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.,* 774 A.2d 332, 340 (D.C.2001) (citing *Johnson v. Jones,* 515 U.S. 304, 313, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995)); *see also Mitchell, supra,* 472 U.S. at 525–29, 105 S.Ct. 2814–17. A claim of immunity from suit under the First Amendment is just such an issue of law, and this court has held that a defendant church may appeal the denial of a motion to dismiss where the motion was based on First Amendment immunity from suit. *See Bible Way Church, supra,* 680 A.2d at 426; *United Methodist Church, supra,* 571 A.2d at 792–93.

■ The trial court's order denying the Trustee's motion to dismiss clearly satisfies the requirements set forth in *Bible Way.* The question of immunity from suit under the Free Exercise Clause of the First Amendment is purely a question of law which the trial court conclusively determined in its ruling against the Trustees. The order denying the Trustees' immunity dealt with an issue utterly separate from the merits of Johnson's defamation claim. Finally, the trial court's order will render the issue of the Trustees' immunity unreviewable on appeal from a final judgment if the case proceeds to trial because the essence of the protection of immunity from suit is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell, supra,* 472 U.S. at 526, 105 S.Ct. at 2815,. This immunity from suit is "effectively lost if a case is erroneously permitted to go to trial." *Id.*

In light of the foregoing, we hold that, under the collateral order doctrine, we have jurisdiction to hear the Trustees' interlocutory appeal from the denial of their Rule 12(b)(1) motion to dismiss on the grounds of lack of subject matter jurisdiction based on their claim of immunity under the First Amendment.

## B. *Standard of Review*

■ In hearing this appeal, our standard of review is *de novo* because "the issue of subject matter jurisdiction is a question of law." *Bible Way Church, supra,* 680 A.2d at 427 (citations and footnote omitted). In determining what, exactly, we will review, we note that a 12(b)(1) motion may be either a "facial" attack on the allegation of jurisdiction in the complaint, or a "factual" attack on the basis of the court's jurisdiction. *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507 (5th Cir.1980), *reh'g denied,* 622 F.2d 1043, *cert. denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980); *Bible Way Church, supra,* 680 A.2d at 427 n. 4. A "facial" attack would require us to determine jurisdiction by looking only at the face of the complaint and taking the allegations in the complaint as true. *Menchaca, supra,* 613

F.2d 507; *Bible Way Church, supra,* 680 A.2d at 427 n. 4. The Trustees' 12(b)(1) motion, however, was a "factual" attack because in the language of *Menchaca,* it "challenge[d] the existence of subject matter jurisdiction irrespective of the pleadings, and matters outside the pleadings such as testimony and affidavits are considered.... Moreover, a 'factual attack' under Rule 12(b)(1) may occur at any stage of the proceedings and plaintiff bears the burden of proof that jurisdiction does in fact exist." *Menchaca, supra,* 613 F.2d at 511 (internal citation omitted). *Accord Cedars–Sinai Medical Ctr. v. Watkins,* 11 F.3d 1573 (Fed.Cir.1993), *cert. denied,* 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994); *Thornhill Publishing Co. v. General Tel. & Electronics Corp.,* 594 F.2d 730, 733 (9th Cir.1979); *McLain v. Real Estate Bd., Inc.,* 583 F.2d 1315, 1318 n. 1 (5th Cir.1978), *vacated and remanded on other grounds,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980); *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977); *Bible Way Church, supra,* 680 A.2d at 427 n. 4 (citations omitted). Perforce, no presumptions of truthfulness adhere to the allegations of the complaint. *Bible Way Church, supra,* 680 A.2d at 427 n. 4 (citations omitted). *Accord Mortensen, supra,* 549 F.2d at 891.

### C. *Immunity Claim*

1. *The Trustees Right to Assert This Immunity.* Before analyzing whether any immunity exists, we must first settle the question of whether the Trustees have a right to the protection of the possible immunity. Johnson maintains, under two alternative theories, that the Trustees may not assert the immunity.

■ Johnson claims first that he sued the Trustees in their individual capacities under D.C.Code § 29–707 (2001) (formerly § 29–907 (1996)), and therefore they may not avail themselves of the protections the First Amendment's affords to churches. Johnson's reliance on this Code section is misplaced, since it specifically refers to the "corporate powers" of trustees of religious societies and consequently delineates their susceptibility to suit as trustees, not as private individuals. D.C.Code § 29–707. Furthermore, although the complaint names each of the Trustees individually, the complaint discusses actions taken by the Trustees as trustees of Mt. Airy, and Johnson's brief in this appeal notes that the complaint named "the 'Trustees' " as "Trustees of the Church," and later states that the "Trustees were named as defendants" in this suit. From all this, it seems plain that the individuals named in Johnson's complaint were named precisely because they were trustees of the church and were being sued as trustees, not as individuals.[3] Thus it is clear that the Trustees may raise this claim of immunity, just as bishops and other officials in hierarchical churches have raised the immunity defense where appropriate even though they were not the church itself. *See, e.g., Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929) (defendant Archbishop's assertion of immunity allowed); *Downs v. Roman Catholic Archbishop of Baltimore,* 683 A.2d 808, 111 Md.App. 616 (Md.1996) (defendant Archbishop's assertion of immunity allowed); *Higgins v. Maher,* 210 Cal.App.3d 1168, 258 Cal.Rptr. 757 (Cal.Ct.App.1989) (defendant Bishop's assertion of immunity allowed).

■ In the alternative, Johnson claims that the Trustees waived their right to assert immunity because they did not appeal the decision rendered in their suit

---

**3.** At oral argument, counsel for Johnson acknowledged that he intended to look to the church assets to satisfy any judgment.

against Johnson. *Hollingsworth v. Johnson*, Case No. 98–CA–65 (D.C.Super.Ct. February 11, 1998). The Trustees could not have raised the immunity issue in their suit against Johnson since they were plaintiffs in that case, and the immunity is a defense. Even if the immunity had been available to any party when the Trustees sued Johnson, the case was treated as a contract dispute by the trial judge. As such, the case would have fallen into a clearly delineated exception (discussed below) to a church's First Amendment immunity from suit. Since the Trustees could not have raised the immunity in their suit against Johnson, they did not waive it by choosing not to appeal when they lost that case.

2. *Immunity from Suit under the First Amendment and Its Exceptions.* The First Amendment to the United States Constitution states, in pertinent part, "Congress shall make no law respecting an establishment of religion, or prohib-

iting the free exercise thereof...." The United States Supreme Court, in a line of cases stretching back to 1871 (*Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871)), has consistently interpreted the Free Exercise Clause as a "constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization ... on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich*, 426 U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151 (1976).[4] This does not mean, however, that churches are above the law or that there can never be a civil court review of a church action. "[N]ot every civil court decision ... jeopardizes values protected by the First Amendment." *Presbyterian Church v. Mary Elizabeth Blue Hull Presbyterian Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969).

4. We realize that most of the cases cited in this opinion involve hierarchical churches which have "judicatories" either internal to the individual churches or as part of the organization to which they belong. In contrast, Mt. Airy is a congregational church. It does not have any sort of internal judicial body nor does it answer to a larger organization. For a congregational church such as Mt. Airy, the congregation is the judicial body. *See Hiscox, supra,* at 186 (authorizing the church to "cite [the pastor] before the body to answer for himself, disprove the charges, or make his defense"); *Gillespie v. Elkins Southern Baptist Church,* 177 W.Va. 88, 92, 350 S.E.2d 715, 719 (W.Va.1986) ("In a congregational church the membership ultimately controls the business of the church and, therefore, has the power to hire and fire the pastor"). *See also Taylor v. Jackson,* 50 App.D.C. 381, 382, 273 F. 345 (1921) (noting that courts have long acknowledged that Hiscox "prescribes the procedure to be followed in Baptist church trials"). While *Watson* did not involve a purely congregational church, the *Watson* court clearly thought that its reasoning could apply to congregational churches. *See Wat-*

*son, supra,* 80 U.S. (13 Wall.) at 725. Although there is precious little additional federal case law involving congregational churches in this constitutional setting, a congregational church's internal organization provides no nuance that would change its standing under the First Amendment or that would require a different constitutional analysis from that afforded to a hierarchical church. *See Nunn v. Black,* 506 F.Supp. 444, 448 (W.D.Va.1981) (applying *Serbian* and declining to adjudicate internal church dispute despite the fact that church had "no structured decision-making process"), *aff'd,* 661 F.2d 925 (4th Cir.1981), *cert. denied,* 454 U.S. 1146, 102 S.Ct. 1008, 71 L.Ed.2d 299 (1982); *Burgess v. Rock Creek Baptist Church,* 734 F.Supp. 30 (D.D.C.1990) (noting that there was no justification for refusing to apply the *Serbian* Court's analysis to a congregational church); *First Baptist Church v. Ohio,* 591 F.Supp. 676, 682 (S.D.Ohio 1983) ("because the 'hands off' policy espoused by the *Serbian* Court is of constitutional dimension, we find it difficult to justify the application of a different standard where a congregational church is involved").

There are several areas in which civil courts continue to have jurisdiction over church actions. Courts may employ "neutral principles of law" in adjudicating disputes over church property. *Id.* (state has legitimate interest in adjudicating property disputes but may only use "neutral principles of law, developed for use in all property disputes"); *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) (resolution of property dispute between church bodies was made on basis of state law, did not involve inquiry into religious doctrine, and therefore presented no substantial federal question); *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) (states may resolve disputes over church property using neutral principals of law approach so long as there is no need to analyze or examine a church's ecclesiastical polity or doctrine). Civil courts also may have jurisdiction over employment disputes where the employee provides a purely secular service for the church. *See EEOC v. Pacific Press Publ'g Ass'n,* 676 F.2d 1272 (9th Cir.1982) (Civil Rights Act applied to editorial secretary in a church publishing house); *EEOC v. Mississippi College,* 626 F.2d 477 (5th Cir.1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981) (Civil Rights Act applied to secular employment decisions of religious institution). *But see Corporation of Presiding Bishop v. Amos,* 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (holding that the section of the Civil Rights Act exempting religious organizations from the Act's ban on religious discrimination in employment did not violate the Establishment Clause and that the exemption shielded a church-run gymnasium from liability under the Act in a suit brought by a building engineer); *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (teachers in church-run schools are not within coverage of National Labor Relations Act). In addition, churches may be held liable under valid contracts. *See Watson, supra,* 80 U.S. at 714 (religious organization's right of contract protected by law); *Minker v. Baltimore Annual Conference of United Methodist Church, et al.,* 894 F.2d 1354, 282 U.S.App. D.C. 314 (1990) (claim arising from oral contract between pastor and church within jurisdiction of court if provable without resort to impermissible avenues of proof). Finally, some courts have found jurisdiction to adjudicate claims that church officials lacked the authority to effect a pastor's discharge. *See, e.g., Stony Island Church of Christ v. Stephens,* 54 Ill.App.3d 662, 12 Ill.Dec. 299, 369 N.E.2d 1313 (1977) (no element of religion involved in deciding issue of church elders had authority to terminate pastor's employment); *Antioch Temple Inc. v. Parekh,* 422 N.E.2d 1337, 383 Mass. 854 (Mass.1981) (court gave effect to decision of congregation); *Vincent v. Raglin,* 318 N.W.2d 629, 114 Mich.App. 242 (Mich.Ct. App.1982) (church trustees did not have authority to remove pastor). None of these exceptions apply to Johnson's defamation claim, which is the only issue remaining in this case as it now stands before us.[5] This appeal does not involve ownership of church property; Johnson was a minister, not a secular employee, of Mt. Airy; Johnson's breach of contract

---

5. Actually, three of Johnson's claims remain, but only as alternative theories of liability. Any argument for or against allowing the defamation claim would apply equally well to invasion of privacy and distortion of likeness or intentional infliction of emotional distress since all three are nonphysical intentional torts. For the sake of convenience and simplicity, we will discuss only defamation in this context. The result we reach as to the defamation claim, however, will dispose of the alternate theories of liability as well.

claim has already been dismissed; and Johnson has never questioned the authority of the church to remove him as pastor. Johnson appears to rely on one other possible exception to the general rule of non-interference, enunciated by the Supreme Court in *Gonzalez, supra,* 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131. There, the Court said, "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are@ accepted in litigation before the secular courts as conclusive...." *Id.* at 16, 50 S.Ct. at 7–8. However, the Court has never given "concrete content to or applied" this apparent exception, and later characterized the entire phrase as "dictum only." *Serbian, supra,* 426 U.S. at 712, 96 S.Ct. at 2382. Because an adjudication of "arbitrariness" would require an inquiry into whether a church followed its internal laws and regulations, the *Serbian* Court held that any theoretical "arbitrariness" exception would not be "consistent" with the constitutional mandate against civil inquiry into the decisions of religious organizations in matters of discipline, faith, internal organization or ecclesiastical rule, custom, or law. *Id.* at 713, 96 S.Ct. at 2382. The *Serbian* Court also noted that the only possible application of the "fraud" or "collusion" language would be "when church tribunals act in bad faith for secular purposes," (*Id.*) but declined to address "whether ... there is room for marginal civil court review under the[se] narrow rubrics." *Id.* (internal quotations omitted). Clearly the Court was not endorsing such a review, but was only leaving the possibility open for future consideration. Even so, the Court was clearly taking a firm position in protecting First Amendment rights by forbidding inquiry into the ecclesiastical decisions of a church absent extraordinary circumstances. *See Hutchison v. Thomas,* 789 F.2d 392 (6th Cir.),

*cert. denied,* 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986).

■ Johnson seems to ask us to apply this potential "fraud or collusion" exception to the Trustees' immunity claim. We decline to do so for many reasons. The "fraud, collusion, or arbitrariness" exception was enunciated as dictum in *Gonzalez. Serbian, supra,* 426 U.S. at 712, 96 S.Ct. at 2382. The Supreme Court has already found the "arbitrariness" portion of the *Gonzalez* exception impossible to apply without infringing on First Amendment protections. *Id.* at 713, 96 S.Ct. at 2382. Even if the "fraud or collusion" portion of the *Gonzalez* exception has "concrete content," it is likely to be as impossible to apply as the "arbitrariness" portion of the exception. Furthermore, the *Serbian* Court's discussion of the "fraud or collusion" portion of the *Gonzalez* exception was itself dictum, since there was no claim or evidence of either fraud or collusion in the *Serbian* case. Finally, there are no extraordinary circumstances here that would warrant an application of a possible exception to First Amendment protections for church decisions.

■ Even if we were inclined to rush in where the Supreme Court has refused to tread, Johnson has made no showing that the exception should be applied here. On a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the crucial question is "whether we can conclude *from reading the complaint* that the ... claim falls within the trial court's constitutionally circumscribed secular jurisdiction." *Bible Way Church, supra,* 680 A.2d at 427 (emphasis added). In discussing the possibility of a "fraud or collusion" exception, the Supreme Court noted that it would only apply when a "church tribunal[ ] act[s] in bad faith for secular purposes." *Serbian, supra,* 426 U.S. at 713, 96 S.Ct. at 2382. In his complaint, John-

son never asserts that the allegedly defamatory manual was published for secular purposes by a church tribunal. "[W]hen the First Amendment casts a shadow over the court's subject matter jurisdiction, the plaintiff is obliged to plead unqualified jurisdictional facts that clearly take the case outside the constitutional bar." *Bible Way Church, supra,* 680 A.2d at 430; *see also Letica Corp. v. Sweetheart Cup Co.,* 790 F.Supp. 702, 706 (E.D.Mich.1992) ("courts have required greater specificity in pleading where the case implicates conduct which is *prima facie* protected by the First Amendment"). Johnson has pleaded no facts that would take his case outside the First Amendment strictures on our jurisdiction under a theory of "fraud or collusion."

■ 3. *Applying First Amendment Immunity Here.* As noted above, courts have consistently held that the Free Exercise Clause of the First Amendment prohibits judicial encroachment into church decisions where those decisions turn on church policy or on religious doctrine or practice. Except for contractual disputes, this prohibition includes church decisions concerning the employment of ministers because selection and termination of clergy is a core matter of ecclesiastical self-governance not subject to interference by a state. *See Serbian, supra,* 426 U.S. at 713, 96 S.Ct. at 2382 (civil courts are constitutionally "bound to accept the decisions of the highest judicatories of a religious organization ... on matters of discipline, faith, *internal organization,* or ecclesiastical rule, custom, or law") (emphasis added); *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America,* 344 U.S. 94, 116, 73 S.Ct. 143, 154–55, 97 L.Ed. 120 (1952) ("Freedom to select the clergy ... must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference"); *Gonzalez, supra,* 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (declining

to assert jurisdiction over a dispute as to whether an Archbishop had acted properly in determining who would be appointed to a chaplaincy); *Minker, supra,* 894 F.2d at 1356 ("whose voice speaks for the church is *per se* a religious matter") (internal quotation omitted); *Hutchison, supra,* 789 F.2d at 396 (declining to assert jurisdiction over a dispute relating to "appellant's status and employment as a minister of the church"); *McClure v. Salvation Army,* 460 F.2d 553, 560 (5th Cir.1972) (a minister's assignment is a matter "of church administration and government and thus, purely of ecclesiastical cognizance"), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972); *United Methodist Church, supra,* 571 A.2d at 794 ("employment disputes concerning the status of pastors are inherently ecclesiastical and cannot constitutionally be subject to review"). Clearly the Free Exercise Clause guarantees Mt. Airy the freedom to decide to whom it will entrust ministerial responsibilities.

■ A church's freedom in these matters is not, however, absolute. *See Bowen v. Roy,* 476 U.S. 693, 699, 106 S.Ct. 2147, 2152, 90 L.Ed.2d 735 (1986) ("Our cases have long recognized a distinction between the freedom of ... belief, which is absolute, and the freedom of ... conduct, which is not absolute."); *Cantwell v. Connecticut,* 310 U.S. 296, 303–304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940) ("[T]he [First] Amendment embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be."). Even though the selection or ouster of a minister is a purely ecclesiastical decision taken in accord with the religious convictions of the church, it is not "totally free from legislative restrictions." *Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963) (quoting *Braunfeld v. Brown,* 366 U.S. 599, 603, 81

S.Ct. 1144, 1146, 6 L.Ed.2d 563 (1961)) (internal punctuation omitted). State restriction on religious activity is allowed when the activity "pose[s] some substantial threat to public safety, peace or order." *Id.* (citation omitted). For example, a church could not select its ministers on the basis of their demonstrated willingness to commit a crime, or by forcing the candidates to play a game of Russian roulette and hiring whoever survived. *See Minker, supra,* 894 F.2d at 1357. Nor may a church seek confidential medical information from a pastor's psychiatrist in making a reappointment determination as to that pastor. *See Alberts v. Devine,* 479 N.E.2d 113, 395 Mass. 59 (Mass.1985), *cert. denied sub nom., Carroll v. Alberts,* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985).

■ Although the Supreme Court has recognized that the religion clauses allow for some state restriction, weighing the free exercise protections against important state interests requires a "delicate balancing." *McDaniel v. Paty,* 435 U.S. 618, 628 n. 8, 98 S.Ct. 1322, 1328 n. 8, 55 L.Ed.2d 593 (1978). *See also Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972) ("The essence of all that has been said and written on the subject [of First Amendment protection] is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."). In applying this balancing test, the Court has concluded that some civil rights and common law claims, which would be protected in a secular setting, "are not sufficiently compelling to overcome certain religious interests." *Minker, supra,* 894 F.2d at 1357 (citing *Gonzalez, supra,* 280 U.S. at 16, 50 S.Ct. at 5). *See, e.g., Serbian, supra,* 426 U.S. at 715, 96 S.Ct. at 2383 (declining to assert jurisdiction over a case brought by a defrocked bishop to have himself declared the true bishop of a diocese, and noting "constitutional concepts of due process, in-

volving secular notions of 'fundamental fairness' or impermissible objectives, are ... hardly relevant to such matters of ecclesiastical cognizance."). In the specific area of the church-minister relationship, other courts have expanded the universe of claims that do not overcome the First Amendment protections to include Civil Rights Act protection from race and sex discrimination and a variety of common law claims. *See, e.g., Minker, supra,* 894 F.2d at 1354 (pastor's claim for violation of federal age discrimination statute dismissed); *Hutchison, supra,* 789 F.2d at 392 (minister's common law claims challenging forced retirement by church dismissed); *Rayburn v. General Conference of Seventh-Day Adventists,* 772 F.2d 1164 (4th Cir.1985) (First Amendment protections precluded application of Civil Rights Act protection to an Associate in Pastoral Care); *Simpson v. Wells Lamont Corp.,* 494 F.2d 490 (5th Cir.1974) (minister's suit for wrongful discharge dismissed).

■ Under most circumstances, defamation is one of those common law claims that is not compelling enough to overcome First Amendment protection surrounding a church's choice of pastoral leader. When a defamation claim arises entirely out of a church's relationship with its pastor, the claim is almost always deemed to be beyond the reach of civil courts because resolution of the claim would require an impermissible inquiry into the church's bases for its action. *See, e.g., Natal v. Christian and Missionary Alliance,* 878 F.2d 1575 (1st Cir.1989) (discharged pastor's claims, including a claim that his reputation was tarnished, dismissed for lack of subject matter jurisdiction); *Hutchison, supra,* 789 F.2d at 392 (minister's claim of defamation (among others) arising from his enforced retirement, dismissed for lack of subject matter jurisdiction); *Yaggie v. Indiana–Kentucky Synod, Evangelical*

*Lutheran Church,* 860 F.Supp. 1194 (W.D.Ky.1994), *aff'd,* 64 F.3d 664 (6th Cir. 1995) (pastor's defamation claim arising from an attempt to obtain his resignation, dismissed for lack of subject matter jurisdiction); *Farley v. Wisconsin Evangelical Lutheran Synod,* 821 F.Supp. 1286 (D.Minn.1993) (pastor's defamation claim arising from *de facto* termination, dismissed for lack of subject matter jurisdiction); *Goodman v. Temple Shir Ami,* 712 So.2d 775 (Fla.Dist.Ct.App.1998) (rabbi's defamation claim, arising from termination of his services, dismissed for lack of subject matter jurisdiction), *review dismissed,* 737 So.2d 1077 (Fla.1999), *cert. denied,* 528 U.S. 1075, 120 S.Ct. 789, 145 L.Ed.2d 666 (2000); *Downs, supra,* 683 A.2d at 808, 111 Md.App. at 616 (former seminarian's defamation claim, arising from a denial of a petition for ordination, dismissed for lack of subject matter jurisdiction); *Hiles v. Episcopal Diocese of Massachusetts,* 773 N.E.2d 929, 437 Mass. 505 (Mass.2002) (pastor's multiple claims, including defamation, arising from church disciplinary proceedings, dismissed for lack of subject matter jurisdiction); *Jae–Woo Cha v. Korean Presbyterian Church of Washington,* 553 S.E.2d 511, 262 Va. 604 (Va.2001) (fired educational pastor's defamation claim dismissed for lack of subject matter jurisdiction), *cert. denied,* —— U.S. ——, 122 S.Ct. 1791, 152 L.Ed.2d 650 (2002). *But see Marshall v. Munro,* 845 P.2d 424 (Alaska 1993) (court had subject matter jurisdiction over the defamation and interference with contract claims in a dispute between a pastor (who had not been hired) and a church official because those claims did not require resolution of a church dispute or the determination of the pastor's qualifications); *Joiner v. Weeks,* 383 So.2d 101, 102 (La.Ct.App.1980) (court noted that it had found subject matter jurisdiction on previous appeal (unpublished opinion) because the former minister plaintiff had al-

leged defamation which was a "quasi-offense" under the Louisiana code).

In most of these cases, the alleged defamatory statements did not overtly express any religious principles or beliefs, but all the actions resulted from conflicts "confined within" the churches involved. *Yaggie, supra,* 860 F.Supp. at 1198; *cf. Conley v. Roman Catholic Archbishop of San Francisco,* 85 Cal.App.4th 1126, 102 Cal.Rptr.2d 679 (2000) (court had jurisdiction over intentional infliction of emotional distress and defamation claims where an allegedly defamatory letter had been published in the local newspaper); *Hayden v. Schulte,* 701 So.2d 1354 (La.Ct.App.1997) (jurisdiction existed for defamation claim of applicant for pastor status where alleged defamation had been intentionally disseminated outside the church). Furthermore, the courts found that it was impossible to consider the plaintiffs' allegations of defamation "in isolation, separate and apart from the church[s'] decision to terminate [the plaintiffs'] employment." *Jae–Woo Cha, supra,* 553 S.E.2d at 516; *c.f. Marshall v. Munro, supra,* 845 P.2d at 424 (jurisdiction existed because resolution of claims did not involve examination of church's determination of pastor's qualifications). "Questions of truth, falsity, malice, and the various privileges that exist often take on a different hue when examined in the light of religious precepts and procedures that generally permeate controversies over who is fit to represent and speak for the church." *Downs, supra,* 683 A.2d at 812. Examining such controversies is precisely the kind of inquiry that is forbidden to civil courts since "[w]hose voice speaks for the church is *per se* a religious matter." *Minker, supra,* 894 F.2d at 1357 (internal punctuation omitted).

This is not to say that religious organizations are immune from all tort claims

arising out of employment decisions relating to their pastors. Torts such as battery, false imprisonment or conversion probably would fall within the exception to church immunity set out in *Sherbert* because they pose a "substantial threat to public safety, peace or order." *Sherbert, supra,* 374 U.S. at 403, 83 S.Ct. at 1793; *see also Higgins, supra,* 210 Cal.App.3d at 1168, 1176, 258 Cal.Rptr. 757. It is also conceivable that torts such as defamation, infliction of emotional distress, and invasion of privacy might be so unusual or egregious as to fall within the *Sherbert* exception. For example, a potentially defamatory charge of child molestation might be actionable under the *Sherbert* exception. *See, e.g., Hayden, supra,* 701 So.2d at 1356 ("[W]here child molestation is at issue, it cannot be considered just an internal matter of Church discipline or administration.").

■ In light of all the foregoing, we hold that constitutional protections afforded by the Free Exercise clause (prohibiting civil court interference in disputes between ministers and churches) extend to defamation claims, when: (1) such a claim flows entirely from an employment dispute between a church and its pastor so that consideration of the claim in isolation from the church's decision as to the pastor is not practical, (2) the alleged "publication" is confined within the church, and (3) there are no unusual or egregious circumstances. This, then, is the outline of the constitutional shadow on our subject matter jurisdiction over such defamation cases. Since, as we noted above, a District of Columbia court does not have jurisdiction to hear claims "when the First Amendment casts a shadow over the court's subject matter jurisdiction" unless the plaintiff pleads "unqualified jurisdictional facts that clearly take the case outside the constitutional bar," *Bible Way Church, supra,* 680 A.2d at 430, we now look to see if, in his complaint, Johnson has "specifically and un-equivocally plead[ed] all facts necessary to establish the court's jurisdiction." *Id.*

■ There is no question that the defamation claim flows entirely from employment dispute so that consideration of the claim in isolation is impossible. The manual was published during the pendency of Johnson's wrongful eviction suit against the church and while Johnson was holding himself out as the pastor of Mt. Airy. The manual documents the grievances against Johnson and the attempts the congregation had made to remove Johnson as pastor of Mt. Airy. As noted earlier, Mt. Airy had formally adopted Hiscox's Principles and Practices for Baptist Churches as its guide for internal procedures. Hiscox provides that the "final action of a Church, as to an accused minister, may take any one of the following forms: . . . c. That of withdrawal of fellowship from him as a minister of the Gospel, *with a declaration* that in their opinion he is unworthy of, and unfit to continue in, the ministerial office." Hiscox, supra, pp. 211–212 (emphasis added). The manual is the "declaration" required by Hiscox. It is essentially a record of the church congregation's ecclesiastical indictment of Johnson and a declaration, pursuant to the religious doctrine of Mt. Airy, that Johnson was not fit to continue as Mt. Airy's pastor. This means that any analysis of the possible defamatory nature of the manual would require us to examine the reasons for Mt. Airy's dismissal of Johnson as pastor. This is the sort of inquiry forbidden to us since we are constitutionally "bound to accept the decisions of the highest judicatories of a religious organization . . . on matters of . . . internal organization." *Serbian, supra,* 426 U.S. at 713, 96 S.Ct. at 2382. "Whose voice speaks for the church is *per se* a religious matter." *Minker, supra,* 894

F.2d at 1357 (internal punctuation omitted).

Johnson's complaint cites only specific statements from the manual as defamatory, thereby implying that the court should not consider the manual as a whole, but only those statements. This further implies that the court could analyze these statements without reference to Mt. Airy's reasons for dismissing Johnson. But if we were to treat these implications as specific and unequivocal facts, we are bound by our prior rulings, which teach us that in determining whether any publication is defamatory, "the publication must be considered as a whole, in the sense it would be understood by the readers to whom it was addressed." *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C.1984). "[A] statement in [the manual] may not be isolated and then pronounced defamatory, or deemed capable of a defamatory meaning. Rather, any single statement or statements must be examined within the context of the entire [manual]." *Klayman v. Segal*, 783 A.2d 607, 614 (D.C.2001). Thus the defamation claim requires consideration of the entire manual. This a court may not do because, as we have already noted, it is impossible to analyze the entire manual without reference to the clerical employment dispute.

 Although Johnson claims inappropriate publication of the manual, he never denotes to whom it was published, and certainly never alleges publication to anyone other than the members of Mt. Airy.[6] This generalized claim of publication simply does not meet the *Bible Way Church* standard for specific and unequivocal pleading of jurisdictional facts that would take us outside the strictures on our jurisdiction.

---

6. We note that Johnson has made neither a showing that the Trustees published the manual to anyone nor a showing that the manual was seen by anyone who did not have the privilege to see it. A crucial element of any defamation action is that "the defendant published the statement without privilege to a third party." *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C.2001). In his deposition, Johnson admitted that he had no evidence that any of the Trustees passed the document to anyone except Diane Tucker. However, Ms. Tucker's affidavit on the matter was not signed by her. Her unsworn statement is no evidence at all.

Even if the unsworn affidavit was evidence of publication to Ms. Tucker, the manual remained a privileged communication since Ms. Tucker was an associate member and a business partner of Mt. Airy at the time. "To be qualifiedly privileged the communication must be one made in good faith upon a subject matter in which the party communicating has an interest or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty ...." *Crowley v. North American Telecomms. Ass'n.*, 691 A.2d 1169, 1173 (D.C. 1997) (internal citation and punctuation omitted). The privilege protects material that would otherwise be defamatory and actionable. *May Dep't Stores Co. v. Devercelli*, 314 A.2d 767, 773 (D.C.App., 1973) (internal citations omitted). This means that church members are protected by a qualified privilege when communicating with other church members about matters of mutual concern or common interest such as reasons for dismissal of the pastor. To defeat a qualified privilege, a plaintiff must present "evidence from which a jury may fairly conclude there was malice in the utterance of the words." *Id.* at 774. However, "if the language of the communication, and the circumstances attending its publication ... are as consistent with the nonexistence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant." *Id.* (internal punctuation and citation omitted).

The circumstances here are certainly consistent with the nonexistence of malice, since the manual is ostensibly Mt. Airy's requisite indictment of Johnson. Therefore Johnson is unable to use malice to defeat the qualified privilege under which the manual was published. Since Johnson failed to prove the "publication" prong of his defamation claim, no valid judgment could have resulted in his favor.

Although he specifically cites several accusations of misconduct contained in the manual, Johnson makes no claim that the alleged defamation involved unusual or egregious circumstances. The accusations Johnson cites appear to be little more than a cataloguing of Mt. Airy's perceived grievances against Johnson. Even if some of the language may be overwrought in the view of some, none of it is noticeably unusual or egregious. Accusations of misconduct, discussions of that misconduct within the church, and the emotional distress and exaggerated language that accompany such activities seem to us to be unavoidable parts of the difficult process by which dissatisfied churches end employment relationships with their pastors. Again, Johnson has failed to make his allegations with the specificity required by *Bible Way.*[7]

Since Johnson failed to plead specific and unequivocal facts that would take the court out of the constitutional stricture on its jurisdiction, he has not survived the Trustees' "factual" attack on the court's subject matter jurisdiction. The trial court erred in denying the Trustees' motion to dismiss.

*Reversed and remanded with instructions to dismiss.*

---

7. It is doubtful at best whether the complaint is adequate to properly survive a 12(b)(6) (failure to state a claim) motion in a non-First Amendment context. *See, e.g., Klayman, supra,* 783 A.2d 607; *Finkelstein, supra,* 774 A.2d at 332; *Atkins v. Industrial Telecommunications Ass'n, Inc.,* 660 A.2d 885 (1995).