*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 23-CV-0836, 23-CV-0837 & 23-CV-0838

FAMILY FEDERATION FOR WORLD PEACE AND
UNIFICATION INTERNATIONAL, *et al.*, APPELLANTS,

V.

HYUN JIN MOON, *et al.*, APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(2011-CA-003721-B)

(Hon. Alfred S. Irving, Jr., Motions Judge)

(Argued February 11, 2025                                    Decided July 3, 2025)

*Cathy A. Hinger*, with whom *Victoria A. Bruno*, *Lela M. Ames*, and *Jasmine Chalashtori* were on the brief, for appellants.

*Derek L. Shaffer*, with whom *William A. Burck* and *Jan-Philip Kernisan* were on the brief, for appellee UCI.

*Jacob M. Roth*, with whom *William G. Laxton*, *David T. Raimer*, and *Henry W. Asbill* were on the brief, for appellee Hyun Jin Moon.

*Michael Weitzner* was on the brief for appellees Richard Perea, JinMan Kwak, and Youngjun Kim.

*Christopher B. Mead* was on the brief for appellee Michael Sommer.

*Jodie E. Buchman*, *Marci A. Hamilton*, *Jessica Schidlow*, *Carina Nixon*, *Jessica Downes*, and *Jennifer Wilczynski* filed a brief on behalf of CHILD USA, Survivors Network of those Abused by Priests, Zero Abuse Project, and Professor Leslie C. Griffin.

Before DEAHL, HOWARD, and SHANKER, *Associate Judges*.

DEAHL, *Associate Judge*: This case comes to this court for a fourth time since plaintiffs/appellants—the Family Federation for World Peace and Unification International, the Universal Peace Foundation, and the Holy Spirit Association for the Unification of World Christianity (Japan) (Family Federation, UPF, and UCJ, respectively)—filed their complaint in May 2011. Appellants' suit arose out of a schism and succession dispute within the Unification Church or Unification Movement. Defendants/appellees—Unification Church International (renamed UCI), UCI's president, Hyun Jin (Preston) Moon, and four of UCI's directors—are on a different side of the schism than appellants. In the most recent appeal, we held that several of appellants' most substantial claims were nonjusticiable under the First Amendment's religious abstention doctrine, since they could not be resolved without answering core questions about religious beliefs and leadership. Post-remand, the trial court dismissed the remaining claims with prejudice across three different orders.

We affirm the trial court's orders, which were based on sound reasoning, and thereby bring this fourteen-year litigation to a close.

**I. Factual Background**[1]

The Reverend Sun Myung Moon founded the Holy Spirit Association for the Unification of World Christianity, a religious institution based in Seoul, South Korea, in 1954. This institution and the greater religion it espoused came to be known colloquially as the "Unification Church," which developed its own religious ceremonies, tithing practices, and holy texts such as its "Divine Principle." Satellite religious institutions outside of Korea were established as the religion grew, including UCJ, which is a "religious corporation" based in Tokyo, Japan. Rev. Moon was believed to be a "messianic" figure known as the "third Adam" within the Unification Church, serving not only as the religion's founder but also its "spiritual leader" for almost sixty years until the final years of his life. He and his now-widow, Hak Ja Han Moon, were known within the religion as the "True Parents of Humankind."

---

[1] Although much of this background was recounted in *Moon v. Fam. Fed'n for World Peace & Unification Int'l* (*Moon III*), 281 A.3d 46 (D.C. 2022), we include it here along with other relevant details from the record for completeness purposes. These facts are undisputed unless otherwise indicated.

*The network of organizations affiliated with
the Unification Church and their relationships*

Since its founding, the Unification Church grew substantially to encompass a variety of cultural and commercial enterprises. Rev. Moon and his supporters founded, for instance, *The Washington Times* newspaper, the Tongil Group business conglomerate, and the True World Group seafood distribution company. Rev. Moon and his supporters also started several nonprofits, including UPF and UCI, the latter of which was established as a nonprofit corporation in the District of Columbia in the 1970s. UCI's original corporate purposes were aimed at supporting the Unification Church and its principles, and UCI was a longtime funding source for projects that Rev. Moon supported. It regularly donated funds to UPF, the Universal Ballet, the University of Bridgeport, *The Washington Times*, a firearms manufacturer, a recording studio and performing arts center, a martial arts association, and True World Group.

For its part, UCI received funding from entities affiliated with the Unification Church such as UCJ, which donated around $100 million annually for many years. UCJ's donations were not made contingent on any specific written agreements or instruments. Rather, they were given with the general intention of supporting UCI's charitable corporate purposes—appellants alleged in their complaint, for example, that the purposes for which the funds were to be used were "reflected in the Articles

of Incorporation of UCI" before their amendment in 2010, which included "assisting, advising, coordinating, and guiding the activities of Unification Churches." There was also deposition testimony and other evidence that the funds were donated with the intention they be put towards "activities under the guidance of the True Parents and international headquarters," "missionary purposes," and UCI's "original purposes." Moreover, there is record evidence of UCI sending solicitation letters to UCJ, in which UCI would request funds and include general information about their upcoming annual budget. These letters, which scarcely changed year-to-year, mentioned UCI's "[b]usiness and other projects which, economically or otherwise, help advance the mission of UCI and the worldwide Unification Church movement."

*Preston Moon's rise, fall, and the religious schism that followed*

In the 1990s, Rev. Moon established the Family Federation, intending it to replace the Holy Spirit Association entity he founded in the 1950s. Part of Rev. Moon's stated rationale for founding the Family Federation was that "[t]he time is coming that we will not need a church" and a new focus on "the family level" was needed. Rev. Moon also announced around this time that his son, Preston, would become the vice president of the Family Federation, and began referring to Preston as "the fourth Adam." Preston testified that he understood this to mean he was

recognized as a "messianic figure" and the spiritual heir to Rev. Moon. Preston soon assumed larger leadership roles in Church-related organizations, becoming president and chairman of UCI in 2006 with Rev. Moon's "wholehearted support." Under Preston's leadership, UCI engaged in a variety of commercial transactions with entities directly or indirectly owned by Preston, including the purchase of a New Jersey building for $5.9 million, the receipt of several years of consulting services worth $120,000/month, and the issuance of a $2 million loan.

Soon after becoming UCI's president, Preston began to advance a particular view of what he believed to be the proper direction for the Unification Church. In a letter directed to Rev. Moon and Hak Ja Han, he wrote that the Unification Church should work towards becoming more of an "interfaith movement that could unite the body of faith through the world." Preston believed this approach was faithful to Rev. Moon's vision that was "rooted in the providential vision of one family under God," referring to Rev. Moon's earlier statements about there no longer being a need for a centralized denominational church. Soon after that letter was sent, Preston's younger brother, Hyung Jin or Sean Moon, was named the president of the Family Federation and was given a crown by Rev. Moon and Hak Ja Han at a "coronation" ceremony. Sean, notably, did not support Preston's interfaith views and wanted the Unification Church to remain "denominational."

Preston, as the president of UCI, then took steps to replace the directors on the UCI board with longtime Church members who shared his view of a decentralized and interfaith movement. Rev. Moon asked Preston to step aside from his UCI role, but Preston refused, wanting to ensure that his group of supporters retained power within the Church. Once his brother Sean replaced Preston as the head of UPF—an organization that UCI assisted financially in hosting "global peace festivals"—Preston founded the Global Peace Foundation (GPF) to hold its own peace festivals. UCI then ceased making contributions to UPF and began funding GPF, which would go on to receive $34 million, the majority of its funding, from UCI.

Under Preston's leadership, UCI made two other substantial changes in the wake of the growing Church schism. First, UCI amended its Articles of Incorporation in order to, in its telling, better reflect Rev. Moon's prior declaration that a "church" was no longer needed and to accommodate "changes in the movement"—it eliminated references to the "Unification Church" and its Divine Principle, for example, and added references to the "Unification Movement" and a new emphasis on "promot[ing] interdenominational, interreligious, and international unification of world Christianity and all other religions." Second, UCI "irrevocably

transfer[ed]" around $500 million[2] in assets to the Kingdom Investments Foundation (KIF), an entity established by UCI agents.  The transfer—about which Rev. Moon, the Family Federation, and UCJ were not consulted—was made pursuant to a donation agreement with terms that mirrored UCI's newly amended articles of incorporation.  These transferred assets included the "Parc1" and "Central City Limited" real estate developments in Seoul and a Korean ski resort.

## II. Procedural Background

Family Federation, UPF, and UCJ sued Preston Moon, UCI, and its directors in the Superior Court in 2011.  The plaintiffs sued Preston and the directors under four distinct theories of breach of fiduciary duty and *ultra vires* acts (Count II),[3] alleging that they: (1) amended UCI's articles of incorporation contrary to UCI's central "mission and purpose"; (2) improperly removed some of UCI's directors "in defiance of [Rev. Moon's] directives"; (3) "engag[ed] in a scheme of self-dealing designed to divert corporate assets to the personal pursuits of Preston Moon"; and (4) "fail[ed] to use [UCI's] assets . . . to support the mission and activities of the

---

[2] Appellants posit that the current market value of these assets "is likely closer to $3 billion," citing to recent news articles about the sale of some of KIF's real estate holdings in Korea.

[3] The trial court later determined Counts I and III of the complaint were abandoned, and appellants never appealed or otherwise contested this determination, so we do not describe these counts here.

Unification Church." Under the heading "Preston Moon Engages in Self-Dealing and Other Improper Transactions"—pertaining to the third theory—the complaint "[s]pecifically" lists the New Jersey property purchase for $5.9 million, the $120,000/month consulting agreement, and the $2 million loan. UCJ also sued UCI for breach of contract (Count IV), promissory estoppel (Count V), and unjust enrichment (Count VI), alleging under these counts that UCI improperly used UCJ's donations in ways that were contrary to the "mission," "purpose," and "activities" of the Unification Church.

In 2018, after two appeals[4] and discovery had wrapped up, all parties moved for summary judgment. As for Count II, while the trial court—Judge Laura Cordero, at this juncture—deemed the plaintiffs to have abandoned their theory about the improper removal of some UCI board members, the court granted summary judgment for the plaintiffs regarding their theories that Preston Moon and the director defendants improperly amended UCI's articles of incorporation and failed to support the Unification Church when they transferred assets to the newly created entities of KIF and GPF. In reaching this conclusion, the trial court found that the

---

[4] *See Fam. Fed'n for World Peace & Unification Int'l v. Hyun Jin Moon* (*Moon I*), 129 A.3d 234 (D.C. 2015); *Unification Church Int'l v. Fam. Fed'n for World Peace & Unification Int'l* (*Moon II*), Nos. 16-CV-0881, 17-CV-0023, Mem. Op. & J. (D.C. Jun. 8, 2018).

First Amendment's religious abstention doctrine did not bar resolution of these claims. As for the "three transactions" challenged "as self-dealing," the trial court granted summary judgment for the director defendants regarding all three transactions, and only the self-dealing claims against Preston Moon relating to the New Jersey property purchase and consulting agreement remained live. The trial court also found genuine issues of material fact remained regarding all of the contract claims (Counts IV-VI), specifically as to whether UCJ's donations to UCI were actually contingent upon UCI using those funds in accordance with its "original purposes" or the "activities" of the Unification Church. In a subsequent remedies order regarding the partial grant of summary judgment in the plaintiffs' favor on Count II, the trial court—Judge Jennifer Anderson at that point—ordered Preston and the director defendants to be removed from the UCI board and ordered that the original articles of incorporation be reinstated. The trial court also held Preston and the director defendants jointly and severally liable for a "surcharge" of $530 million.

Preston Moon and the director defendants appealed the partial grant of summary judgment, and we reversed. In *Moon III*, we held that the trial court's resolution of plaintiffs' claims turned on deciding disputed questions of religious doctrine and purpose, rendering them nonjusticiable under the First Amendment's abstention doctrine. 281 A.3d at 61. Whether the changes to UCI's articles—for example, the move from "Unification Church" to "Unification Movement," and the

excision of any reference to the Divine Principle—were an impermissible abandonment of UCI's central mission hinged on determining core religious questions: for instance, whether the "Unification Movement" could properly be considered part of the "Church," and inquiring into the doctrinal importance of the Divine Principle within the religion. *Id.* at 64-67. Accordingly, these claims involved disputed "theological question[s] that we h[ad] neither the expertise nor authority to answer." *Id.* at 64.

As for the transfers to KIF and GPF, whether those actions contradicted UCI's original purposes similarly depended on which side of the interfaith-vs.-denominational debate you stood on. Such a determination would require an analysis of what exactly promoting "the activities of Unification Churches" and "theology of the Unification Church" included and excluded, a determination that we could not permissibly make under the First Amendment. *See id.* at 57, 69-70. Moreover, we strongly disagreed with plaintiffs' attempt to differentiate the KIF and GPF transfers from UCI's long history of donating to nonsectarian entities (e.g., *The Washington Times*, a firearms manufacturer, etc.) on the basis that Rev. Moon himself, as the "true leader" of the Church, approved those prior donations. *Id.* at 68-69. Any such distinction would require us to find both that the Unification Church was a hierarchical organization "in which the judgments of church leaders carry dispositive weight in church disputes," and also that Preston Moon was not

Rev. Moon's rightful successor at the time he made the transfers—determinations that we could not make via any "neutral principles" of law. *Id.* at 69-70.

We did not address, however, the trial court's analysis as to the self-dealing theory of Count II, which we said "may yet have some legs." *Id.* at 70. Stating that there was a "potential exception" to the religious abstention doctrine in cases of "fraud or collusion" where religious figures "act in bad faith for secular purposes," we instructed that "the trial court may consider [the exception] on remand if appropriate." *Id.* at 70-71 (internal quotation marks omitted). We further noted that the contract claims, which were not on appeal in *Moon III*, "remain live in the trial court." *Id.* at 60 n.15.

On remand, the trial court—Judge Alfred S. Irving, Jr. now—dismissed the outstanding claims with prejudice across several orders. The trial court determined that in the wake of *Moon III*, (1) no claims remained against the director defendants; (2) appellants now lacked "special interest standing"—a requirement for some plaintiffs challenging the acts of charitable corporations like UCI—to pursue their remaining self-dealing claims against Preston Moon after *Moon III* doomed the most substantial claims in the complaint; and (3) the potential fraud or collusion exception did not apply to the remaining contract-based claims against UCI, which it found were also barred by religious abstention. And in another order, the trial court

(4) denied appellants' motion to reopen discovery—which included subsidiary requests to designate an expert and hold an evidentiary hearing—with respect to the fraud or collusion exception and recent statements made by Preston Moon after the discovery period had ended. This appeal followed.

### III. Analysis

Appellants raise a litany of arguments on appeal identifying alleged errors in the trial court's analysis. We first address appellants' argument that their self-dealing claims that survived *Moon III* encompassed the KIF and GPF transfers, an issue we tackle first because it dovetails into other arguments raised in this appeal. We then address five other distinct arguments (and their various sub-arguments), with four pertaining to the orders listed above and a fifth relating to appellants' contention, raised for the first time in this appeal, that they have been denied access to the courts on account of their religion.

*A. Neither the KIF nor GPF transfer were ever part of a self-dealing claim.*

Post-remand, the director defendants and Preston Moon separately moved to dismiss the remaining claims against them under Super. Ct. Civ. R. 12(c) ("motion for judgment on the pleadings") and 12(b)(6) ("failure to state a claim upon which relief can be granted"). In Judge Irving's orders granting the two motions, the trial

court determined that appellants never alleged that the KIF or GPF transfers were instances of self-dealing under the theory of Count II that survived *Moon III*. Appellants contend this was error, arguing that (1) a prior trial court order decided that the KIF and GPF transfers were part of the self-dealing claim, which became the law of the case and binding on us because it was not challenged in previous appeals; and (2) in any event they adequately pled the KIF and GPF transfers as instances of self-dealing.

"We review de novo an order granting a Rule 12(b)(6) motion to dismiss for failure to state a claim and a Rule 12(c) motion for judgment on the pleadings." *Fourth Growth, LLC v. Wright*, 183 A.3d 1284, 1288 (D.C. 2018) (emphasis omitted). To survive either type of motion, a complaint must present "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011) and citing Super. Ct. Civ. R. 8(a)). "Pleadings that 'are no more than conclusions are not entitled to the assumption of truth,' and are insufficient to sustain a complaint." *Grimes v. Dist. of Columbia, Bus. Decisions Info. Inc.*, 89 A.3d 107, 112 (D.C. 2014) (quoting *Potomac Dev. Corp.*, 28 A.3d at 544). In analyzing a motion under Rule 12(c) or 12(b)(6), a trial court cannot "consider matters outside the pleadings" without converting it into a motion for summary judgment. *Id.* at 111.

Considering the relevant law and the language in appellants' complaint, we reject both of appellants' arguments that the trial court should have found the KIF or GPF transfers to be instances of alleged self-dealing.

### i. The law of the case doctrine does not apply.

Appellants' first argument invokes the law of the case doctrine, which generally "prevents relitigation of the same issue in the same case by courts of coordinate jurisdiction." *Sowell v. Walker*, 755 A.2d 438, 444 (D.C. 2000) (emphasis omitted) (quoting *Johnson v. Cap. City Mortg. Corp.*, 723 A.2d 852, 857 (D.C. 1999)). Appellants point to a 2016 preliminary injunction order issued by Judge John Mott, where he concluded in a footnote that "paragraph 117 of the Complaint"—which outlined appellants' four theories of breach of fiduciary duty in Count II—"arguably does encompass the KIF donation." Appellants contend that this order finally determined that the KIF transfer in particular was an example of self-dealing and accordingly must be considered law of the case, such that (1) it should have bound Judge Irving when ruling on the director defendants' and Preston Moon's motions, and (2) it now binds us because it was not challenged in either of the prior appeals post-dating that 2016 ruling. *See Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C. Cir. 1987) ("[A] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the

opportunity to do so existed, becomes the law of the case for future stages of the same litigation.").

There are a host of flaws with this argument, foremost among them is that appellants fatally mischaracterize what Judge Mott said in his footnote. The footnote says that the KIF transfer "arguably" falls under "paragraph 117," but only where that paragraph describes how the directors (1) permitted assets to be used in a way contrary to the "mission and purpose for which [UCI] was formed," and (2) failed to use assets "to support the mission and activities of the Unification Church." The "arguably" caveat alone precludes this ruling from having any preclusive force, *see Pannell v. District of Columbia*, 829 A.2d 474, 478 (D.C. 2003) (explaining that the law of the case doctrine applies only where "the first court's ruling is sufficiently final"), but even if you ignore that, Judge Mott was expressly referring to the distinct, non-self-dealing theories of Count II that we found nonjusticiable in *Moon III*. Judge Mott's order simply did not address the same question as Judge Irving—which was whether the KIF and GPF transfers were pled as acts of self-dealing—so that the law of the case doctrine has no application here. *Sowell*, 755 A.2d at 444 ("The doctrine has no application where the issue presented to a second judge is not identical to the question previously decided by the first judge.").

ii. Appellants never pled the KIF or GPF transfers as instances of self-dealing.

Appellants' second argument, persisting that its self-dealing claims encompassed the KIF and GPF transfers, fails on its merits. A claim of self-dealing alleges a breach of the duty of loyalty, which corporate officers and directors owe to the corporation they lead. *See* 11 William Meade Fletcher *et al*., Fletcher Cyclopedia of the Law of Corporations § 837.60 (Sept. 2024 update) ("The duty of loyalty mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director."); *see also Moon I*, 129 A.3d at 251 ("[D]irectors are subject to the fundamental fiduciary duties of loyalty and disinterestedness." (quoting *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988))). An impermissible self-dealing transaction is one in which there is a "conflict between duty and self-interest," Fletcher, *supra*, at § 837.60, which generally involves "appear[ing] on both sides of a [corporate] transaction," expecting to obtain "personal financial benefit" from a corporate transaction, or otherwise having a stake in the transaction that is at odds with the corporation's interests. *Behradrezaee v. Dashtara*, 910 A.2d 349, 363 (D.C. 2006) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

Here, appellants' complaint never described the KIF or GPF transfers as instances of self-dealing. To start, the section of the complaint on "Preston

Moon[’s] . . . Self-Dealing” only describes three transactions: the New Jersey property purchase, the consulting agreement, and the loan. The complaint then says that “*these* related party transactions constituted a breach of [Preston Moon’s] duty of loyalty.” Nowhere in the complaint are the KIF transfer, the GPF transfer, or some act that could be liberally construed as either transfer described as a transaction where Preston Moon or the director defendants were on “both sides” or “expect[ed] to derive any personal financial benefit.” *Id.* (quoting *Aronson*, 473 A.2d. at 812). In fact, the complaint does not once mention the KIF transfer by name—the KIF transfer was revealed in discovery, and appellants never amended their complaint to allege that it was an instance of self-dealing.

There is one small wrinkle with respect to the GPF transfer, where the complaint notes that Preston Moon originally created GPF “for his own purposes.” But those four nonspecific words do not make out a legally sufficient complaint for a breach of fiduciary duty claim predicated on self-dealing. That phrase does not fairly describe, even implicitly, a “conflict between [Preston’s] duty and self-interest,” Fletcher, *supra*, at § 837.60, or meaningfully explain a “personal financial benefit” that Preston expected to obtain from the GPF donation, *Behradrezaee*, 910 A.2d at 363 (quoting *Aronson*, 473 A.2d. at 812). Preston would surely admit that the GPF and KIF transfers were “for his own purposes” in some sense; namely, in his telling his own purposes include advancing the interests of the Unification

Church as he sees it, and redirecting the religion from where those on the other side of the schism would steer it. That of course would not amount to self-dealing, and appellants cannot retroactively smuggle a self-dealing claim into a single phrase in their complaint that is so vague and nondescript. Appellants simply did not—despite ample opportunity—plead the GPF transfer as an instance of self-dealing with at least some factual elucidation supporting that contention. *See Grimes*, 89 A.3d at 112 ("Pleadings that 'are no more than conclusions are not entitled to the assumption of truth' and are insufficient to sustain a complaint." (quoting *Potomac Dev. Corp.*, 28 A.3d at 544)).

Appellants' last gasp is that the trial court should have followed the "principle" that "pleadings are deemed to conform to the evidence." We take this argument to mean that although the complaint never mentions KIF or the director defendants' roles in GPF, both things should have fallen under the self-dealing allegations in the complaint after the existence of KIF and these roles were uncovered in discovery. But the idea that pleadings automatically "conform to the evidence"—regardless of what those pleadings say—has no basis in law. Our rules establish a mechanism through which parties can request to amend their pleadings under certain circumstances, *see Williams v. Bd. of Trs. of Mount Jezreel Baptist Church*, 589 A.2d 901, 904 n.1 (D.C. 1991) (Super. Ct. Civ. R. 15 "permits

amendment of pleadings to conform to the evidence."), and appellants did not successfully avail themselves here of that mechanism.

The trial court correctly concluded that the self-dealing claims that survived *Moon III* did not encompass the KIF and GPF transfers.[5]

---

[5] Although we limit our review to the trial court's analysis of the pleadings themselves, the record supports appellees' contention that this move (calling the KIF and GPF donations acts of "self-dealing") was an about-face in appellants' theory of the case. The parties' conduct and court rulings throughout the litigation show that before the most recent remand, the KIF and GPF transfers were never considered to be part of appellants' self-dealing claims:

- Appellants referred in a filing to their "claims alleging breach of fiduciary duty arising from UCI's donations to KIF and GPF; UCI's amendment of its 1980 Articles of Incorporation; *and three self-dealing transactions*," in a clear reference to the purchase of the New Jersey property for $5.9 million, the $120,000/month consulting services agreement, and the $2 million loan. Another filing of theirs similarly described "three related-party transactions."

- Appellants on several occasions distinguished the three self-dealing transactions from the KIF and GPF transfers when describing their damages (after Judge Cordero granted them partial summary judgment). For example, appellants said in a filing that "[a] few Count II self-dealing claims against Preston Moon remain in the case" that involve "comparatively minor . . . amounts" of money relative to "the amounts at issue for the Count II claims as to which [Judge Cordero] entered summary judgment."

- Judge Cordero's summary judgment order mentioned how appellants "challenge three transactions . . . as self-dealing." The order then further describes how she granted summary judgment in favor of appellants on the KIF and GPF transfers, while at the same time she did not mention KIF or GPF when describing the self-dealing transactions that "remain[ed] pending."

*B. The dismissal of the complaint with respect to the director defendants was proper where no claims remained against them after* Moon III.

Appellants next argue that the trial court erred in granting the director defendants' motion for judgment on the pleadings under Rule 12(c), in which the director defendants contended that "nothing remains" regarding the Count II breach of fiduciary duty claims against them, and accordingly there "is no valid basis in law" to keep them in the case. The trial court reasoned that the paragraphs of the complaint discussing the surviving self-dealing claims "only identify Preston [Moon]," and appellants argue on appeal that this reasoning involved a misreading of their complaint.

Reviewing the dismissal de novo, we agree with the trial court that the plain language of the complaint shows that Preston Moon, *not* the director defendants, was the target of the self-dealing claim. To start, when describing the self-dealing theory of Count II, the complaint alleges that the "Individual Defendants . . . engag[ed] in a scheme of self-dealing designed to divert corporate assets to *the personal pursuits of Preston Moon*." (emphasis added). In other areas, too, the complaint describes the use of UCI funds for "Preston Moon's personal . . . projects," "[Preston Moon's]

---

- *Moon I* distinguished between (1) appellants' claim involving "the diversion of corporate expenditures" to GPF from (2) appellants' claim that "Preston Moon used his powers as President and Chairman of UCI to engage in self-dealing." 129 A.3d at 241-42.

own personal activities," and "self-dealing transactions by Preston Moon." But the complaint never describes, directly or indirectly, diverting corporate assets to the "personal pursuits of the director defendants" or anything similar.

Moreover, the complaint contains its own separate section titled "*Preston Moon* Engages in Self-Dealing and Other Improper Transactions," which goes onto describe the New Jersey property purchase, the consulting agreement, and the loan in some detail, including a description of how Preston Moon—through entities that he "wholly owned"—was on both sides of those transactions. (emphasis added). In that section, Preston Moon's name is mentioned six times and none of the director defendants are named (or impliedly referenced) even once. So although the complaint contains one general reference to the "Individual Defendants" when discussing self-dealing, all in all it fails to provide any factual content about the director defendants' potential roles or interests in the three enumerated self-dealing transactions. *See Behradrezaee*, 910 A.2d at 363; Fletcher, *supra*, at § 837.60.

Appellants latch onto one sentence in the complaint that says the "Individual Defendants" owed a "duty not to divert corporate assets . . . for personal gain." But still, we are left with no allegations that could support a self-dealing claim against any of the director defendants. This sentence merely describes a general legal principle and does not come close to making out a sufficient self-dealing claim.

In sum, because Preston Moon is the sole target of the self-dealing claim involving the three enumerated transactions—and because, as we found above, there was no outstanding KIF- or GPF-related self-dealing claim levied against the director defendants—the trial court properly determined that no claims remained against the director defendants after *Moon III* in its Rule 12(c) dismissal.[6]

*C. The dismissal of the remaining claims against Preston Moon under Rule 12(b)(6) was proper where appellants lost special interest standing after* Moon III.

Appellants also challenge Judge Irving's order granting Preston Moon's motion to dismiss for lack of special interest standing. Special interest standing is a prerequisite for certain private plaintiffs[7] who wish to challenge the actions of a "charitable trust" or "charitable corporation[]"—it requires, among other things, that the plaintiffs challenge an "extraordinary measure threatening the existence" of the charitable entity. *Hooker v. Edes Home*, 579 A.2d 608, 612-15 (D.C. 1990). Judge Irving's reasoning in granting Preston Moon's motion was that *Moon III* removed

---

[6] Because we hold that judgment on the pleadings was proper in this regard, we do not reach appellees' alternative argument that the KIF and GPF transfers could not have been self-dealing as a matter of law on this record.

[7] Some private plaintiffs do not need to establish special interest standing where their standing is established by statute. *See* D.C. Code § 19-1304.05(c) ("The settlor of a charitable trust, among others, may maintain a proceeding to enforce the trust."); *Farina v. Janet Kennan Hous. Corp.*, Nos. 23-CV-0832 & 24-CV-0045, 2025 WL 1462269, at *8 (D.C. May 22, 2025). None of the parties argue that a statute provides a basis for standing here.

the KIF and GPF transfers from appellants' remaining claims against him, causing the "size and scale" of their claims to substantially diminish so that they no longer had special interest standing because they no longer challenged any extraordinary measure. Appellants' claims were dismissed with prejudice.

Appellants argue on appeal that (1) special interest standing was not lost, and contend in the alternative that (2) the law of the case precluded Judge Irving from issuing any ruling on special interest standing. They also contend that any dismissal for lack of special interest standing should have been (3) without prejudice; and (4) with leave to amend their complaint.

We address these arguments in turn, reviewing de novo the trial court's grant of a 12(b)(6) motion and resolution of the question of standing. *See Colbert v. District of Columbia*, 304 A.3d 199, 202 (D.C. 2023) (reviewing 12(b)(6) dismissal de novo); *District of Columbia v. ExxonMobil Oil Corp.*, 172 A.3d 412, 418-19 (D.C. 2017) (reviewing de novo questions of both Article III and prudential standing). We accept the non-moving party's allegations in the complaint as true and draw all reasonable inferences in their favor. *Colbert*, 304 A.3d at 203.

### i. After *Moon III*, appellants no longer challenged "extraordinary measures" as required to establish special interest standing.

Appellants' argument that special interest standing remained after *Moon III* rises and falls with their argument about whether the surviving self-dealing claims encompassed the KIF and GPF transfers. In their briefing, they do not focus their special interest standing analysis on the three enumerated self-dealing transactions, contending mainly that "[t]he *KIF transfer* was an extraordinary measure." For good reason—the surviving three transactions, which are all that remain given our conclusion above that the KIF and GPF transfers were not part of the self-dealing claims, fall well short of what our case law treats as extraordinary measures.

Generally, "only a public officer, usually the state Attorney General, has standing to bring an action to enforce the terms" of a "charitable corporation[]." *Moon I*, 129 A.3d at 244 (quoting *Hooker*, 579 A.2d at 612).[8] But an exception to this rule exists called special interest standing—private plaintiffs have such standing to sue when (1) they belong to a "particular class of potential beneficiaries" that "is sharply defined and its members are limited in number"; and (2) the plaintiffs challenge an "extraordinary measure" taken by the charitable corporation. *Hooker*,

---

[8] Special interest standing rules apply to both charitable trusts and charitable corporations. *See Moon I*, 129 A.3d at 244 n.15.

579 A.2d at 614-15; *Farina*, 2025 WL 1462269, at *8. These requirements exist to protect charitable corporations from "vexatious litigation" brought by "any and all of a large number of individuals," which could unduly hinder their operations in the District. *Hooker*, 579 A.2d at 612.

An extraordinary measure—the second element of the analysis—is an action that "threaten[s] the existence" of the charitable corporation, as opposed to "an ordinary exercise of discretion on a matter expressly committed" to the corporation's leaders. *Id.* at 615. For example, we determined in *Hooker* that the sale of a home for "elderly, indigent widows" and "the planned transfer of its functions to another entity" was an extraordinary measure—the residents of the home stood "at a crossroads they are unlikely to face again," having been confronted with the threatened loss of both their residence and the entire organization that had provided them with support. *Id.* at 608, 616-17.

Here, the three allegedly self-dealing transactions—which, again, are the only actions of Preston Moon still of relevance—come nowhere close to being extraordinary measures. The purchase of the New Jersey property for $5.9 million, the $120,000/month consulting services agreement, and the $2 million loan, even when taken in combination are picayune in the scheme of assets that UCI controlled—totaling billions of dollars—and they in no way threatened UCI's

existence. UCI received around $100 million per year from UCJ, and recently received over $100 million from the sale of D.C. area buildings. UCI, to say the least, was not going to go bankrupt from these three transactions. Rather, these transactions were comparatively small and run-of-the-mill, qualifying as "ordinary" matters of discretion that Preston Moon and UCI's leadership were charged with handling as leaders of the corporation. *Id.* at 615. The facts here are a far cry from the existential threat that the charitable home in *Hooker* faced, and we thus conclude that the trial court properly dismissed the complaint as to Preston Moon for lack of special interest standing.[9]

### ii. The law of the case doctrine did not bind Judge Irving to any prior rulings on special interest standing.

Appellants next argue that "[p]rior rulings" finding special interest standing "remain law of the case" and should have prevented Judge Irving from ruling otherwise. The prior rulings to which appellants cite are *Moon I*, Judge Cordero's order granting appellants' partial summary judgment, and Judge Anderson's subsequent remedies order.

---

[9] Because appellants fail to meet the second element of the special interest standing analysis, we do not address the parties' arguments surrounding the first element.

But as we noted earlier, the law of the case doctrine "has no application where the issue presented to a second judge is not identical to the question previously decided by the first judge." *Sowell*, 755 A.2d at 444. Here, years after the rulings that appellants now rely upon, this court decided *Moon III* and drastically changed the special interest standing calculus. In *Moon I*, the extraordinary measures we identified were the steps Preston Moon and others allegedly took to "fundamentally chang[e] the purpose of UCI" and "divest itself from the Unification Church." 129 A.3d at 245 n.18. This plainly refers to the amendments to UCI's articles of incorporation and the KIF and GPF transfers, which fell from the case against Preston Moon after *Moon III*. The law of the case doctrine thus posed no bar to Judge Irving when he ruled that appellants lacked special interest standing post-remand.[10]

---

[10] Appellants also argue that resolving the claims against Preston Moon on special interest standing grounds contradicts "the primary purpose of *Moon III*'s remand," which they say was to permit them to present evidence and arguments on the fraud or collusion exception to the religious abstention doctrine. Appellants also note that *Moon III* did not "question" their standing. But these contentions mischaracterize *Moon III*. We expressed no opinion as to the continued existence of special interest standing in *Moon III* because it was not raised on appeal, and our instructions to the trial court were to consider the fraud or collusion exception "if appropriate." 281 A.3d at 71. These instructions were followed—the trial court on remand discussed (albeit briefly) the fraud or collusion exception with respect to appellants' contract claims, and we address the trial court's resolution of that issue in section III.D., *infra*.

### iii. The trial court properly dismissed the claims against Preston Moon with prejudice under Rule 12(b)(6).

In the event we determine they lack special interest standing, appellants claim the trial court improperly dismissed their claims against Preston Moon under Super. Ct. Civ. R. 12(b)(6) ("failure to state a claim upon which relief can be granted") rather than 12(b)(1) ("lack of subject-matter jurisdiction"). Appellants make this argument because dismissals under 12(b)(1), as opposed to dismissals under 12(b)(6), "may only result in a dismissal without prejudice," potentially allowing them to file suit again. *UMC Dev., LLC v. District of Columbia*, 120 A.3d 37, 48 (D.C. 2015). In particular, appellants take issue with the trial court's characterization of special interest standing as a question of "prudential standing," which they say wrongfully "allowed it to consider Preston Moon's motion as one brought under Rule 12(b)(6)."

Dismissals for lack of Article III standing fall under Rule 12(b)(1), while parties' lack of prudential or statutory standing should prompt a dismissal under Rule 12(b)(6). *ExxonMobil*, 172 A.3d at 418 n.8 (citing *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011)); *see also Potter v. Cozen & O'Connor*, 46 F.4th 148, 151 (3d Cir. 2022) (A challenge to "prudential" standing is "properly considered under Rule 12(b)(6), not Rule 12(b)(1)."). An attack on Article III standing is a challenge to the court's subject-matter jurisdiction. *UMC*

*Dev.*, 120 A.3d at 42-43. An attack on prudential standing, by contrast, argues that the plaintiffs are not the proper parties to "invoke the courts' decisional and remedial powers" to adjudicate the underlying live dispute. *Consumer Fed'n of Am. v. Upjohn Co.*, 346 A.2d 725, 727 (D.C. 1975) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see also ExxonMobil*, 172 A.3d at 419 & n.9.

The trial court was correct that appellants' lack of special interest standing is a prudential rather than a jurisdictional defect. The *Hooker* special interest standing rules applicable to charitable corporations were judicially created and designed to avoid "vexatious litigation" resulting from "a large number of individuals who might benefit incidentally from the trust." 579 A.2d at 612. This is akin to prudential standing's "judicially self-imposed limits on the exercise . . . of jurisdiction," such as the rules prohibiting parties from litigating "generalized grievances," *ExxonMobil*, 172 A.3d at 419 (internal quotation marks omitted), or the rules preventing plaintiffs from suing under a law when they fall outside the "zone of interest" that the law seeks protect, *see Kalorama Citizens Ass'n v. SunTrust Bank Co.*, 286 A.3d 525, 533-35 (D.C. 2022) (applying prudential standing principles to the question of who can sue to enforce public easements). This demonstrates that special interest standing falls under the umbrella of prudential standing. It asks the question of which "class of persons" may sue to bring a claim as matter of "judicial self-governance," *Consumer Fed'n*, 346 A.2d at 727 (quoting *Warth*, 422 U.S. at

499), regardless of whether they check Article III's injury, causation, and redressability boxes.

This leads us to another reason why a lack of special interest standing is grounds for 12(b)(6), rather than 12(b)(1), dismissal. Special interest standing is not based on Article III's "case and controversy" requirement and does not relate to subject matter jurisdiction, rendering 12(b)(1) an inappropriate vehicle for dismissal. *See Hooker*, 579 A.2d at 611-15 (drawing special interest standing principles from the common law of trusts). Indeed, our precedents already reflect that special interest standing motions are typically brought under Rule 12(b)(6) or 12(c). *See, e.g., Moon I*, 129 A.3d at 244 (referring to "challenges based on lack of [special interest] standing and failure to state a cause of action pursuant to Super. Ct. Civ. R. 12(b)(6)"); *Bd. of Dirs., Washington City Orphan Asylum v. Bd. of Trs., Washington City Orphan Asylum*, 798 A.2d 1068, 1073 (D.C. 2002) (defendants' special interest standing argument raised in 12(c) motion for judgment on the pleadings); *see also He Depu v. Yahoo! Inc.*, 950 F.3d 897, 900 (D.C. Cir. 2020) (argument raised in 12(b)(6) motion).

The trial court thus properly dismissed the claims against Preston Moon with prejudice under Rule 12(b)(6). *Freyberg v. DCO 2400 14th St., LLC*, 304 A.3d 971,

981 (D.C. 2023) (dismissals under 12(b)(6) are "adjudication[s] on the merits" and are "assumed to be with prejudice").

### iv. The trial court did not abuse its discretion by denying appellants leave to amend their complaint in order to plead the KIF and GPF transfers as self-dealing.

Appellants' final attempt to keep their litigation alive against Preston Moon (and they direct this argument at the director defendants as well) is their contention that the trial court should have dismissed their complaint with leave to amend, specifically so that they could plead the KIF and GPF transfers as examples of self-dealing. Appellants requested leave to amend, which the trial court denied, in their opposition to Preston Moon's 12(b)(6) motion to dismiss. Appellants argue on appeal that the trial court, in denying their request, unduly focused on the "length of time [the] case has been pending."

"We review a trial court's decision to grant or deny leave to amend a pleading only for abuse of discretion." *U.S. Bank Tr., N.A. v. Omid Land Grp., LLC*, 279 A.3d 374, 381 (D.C. 2022). Leave to amend should generally be granted "freely . . . when justice so requires." Super. Ct. Civ. R. 15(a)(3). "Factors affecting the court's discretion include: '(1) the number of requests to amend; (2) the length of time that the case has been pending; (3) the presence of bad faith or dilatory reasons for the request; (4) the merit of the proffered amended pleading; and (5) any prejudice to the non-moving party.'" *Pannell*, 829 A.2d at 477 (quoting *Crowley v. N. Am.*

*Telecomm. Ass'n*, 691 A.2d 1169, 1174 (D.C. 1997)). Although we have held that denying leave to amend solely on the basis of delay "may be reversed," *Eagle Wine & Liquor Co. v. Silverberg Elec. Co.*, 402 A.2d 31, 35 (D.C. 1979), we have also said that "[t]he lateness of a motion for leave to amend . . . may justify its denial if the moving party fails to state satisfactory reasons for the tardy filing and if the granting of the motion would require new or additional discovery." *Pannell*, 829 A.2d at 477 (citing *Eagle Wine*, 402 A.2d at 35).

Judge Irving's conclusion that leave to amend was improper followed an analysis of all the appropriate factors and falls well within the range of permissible outcomes. Judge Irving noted that although this was appellants' first request to amend and that there was no clear evidence of bad faith, this request was made twelve years into the litigation—after multiple completed appeals to this court—and would have been prejudicial to Preston Moon and the director defendants. The prejudice stemmed from the fact that appellants' theory of the case was changing last-minute (the KIF and GPF transfers were only now being alleged to be self-dealing) and their request for leave to amend was accompanied by new discovery demands. Judge Irving was also unmoved by appellants' justification for waiting so long to amend, which was that the KIF transfer was revealed only in discovery. In his words, "[appellants] discovered [the KIF and GPF] transactions . . . by 2013 at the earliest and 2017 at the latest," meaning appellants had all the information

necessary to seek leave to amend six to ten years before they actually sought that leave.[11] Furthermore, Judge Irving found the fourth *Pannell* factor—regarding the merit of the proposed amendment—weighed against appellants because they had not even "proffered a proposed amended Complaint nor detailed what specific amendments they envision," having only suggested that they would amend to include the GPF and KIF transfers within "the scope of the self-dealing claim."

Appellants' invocation of *Miller-McGee v. Washington Hosp. Ctr.*, 920 A.2d 430 (D.C. 2007), does not help their case. In *Miller-McGee*, we held that the trial court abused its discretion by not sua sponte offering the plaintiff an opportunity to amend her complaint. 920 A.2d at 434-39. But as appellees note, we reached this conclusion because the case presented "exceptional circumstances"—the traditional leave to amend factors weighed overwhelmingly in the plaintiff's favor, and there was evidence that the plaintiff's failure to move for leave to amend was induced by the court. *Id.* at 437-39. There are no such exceptional circumstances here. Our case law, in fact, strongly supports Judge Irving's conclusion. *See, e.g.*, *Pannell*, 829 A.2d at 477 (lateness, prejudice to non-moving party, and lack of explanation

---

[11] Appellants do not contest the issue of when they discovered the KIF transfer on appeal. But it is fair to say that appellants discovered the KIF transfer by July 2016 at the latest, given that it was substantively mentioned in Judge Mott's preliminary injunction order issued that month. At bottom, therefore, the delay in seeking leave to amend was no less than seven years.

for lateness justified denial of leave to amend); *see also Va. Acad. of Clinical Psychs. v. Grp. Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1239-41 (D.C. 2005) (affirming denial of leave to amend where amendment (1) was sought two years after complaint was filed and seven months after close of discovery; (2) would have required additional discovery; and (3) followed the completion of summary judgment briefing). In sum, the trial court did not abuse its discretion in denying appellants leave to amend.

*D. Summary judgment for UCI was proper where religious abstention barred resolution of UCJ's contract claims as a matter of law.*

We next consider the trial court's order dismissing UCJ's remaining contract claims against UCI on religious abstention grounds, where it found that resolution of the claims would require a "constitutionally impermissible inquiry into contested matters of Unification Church doctrine, polity, and practice." The court reached this conclusion after considering that the contract conditions at issue hinged upon the meaning of disputed phrases such as "the activities of the Unification Church," much like the issues we held in *Moon III* could not be resolved without running afoul of the religious abstention doctrine. The trial court also declined to apply the potential fraud or collusion exception to its analysis, reasoning that it was "immaterial" to the contract claims and that appellants "made no showing" that it "should be applied."

We review a grant of summary judgment de novo. *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583 (D.C. 2001). "To prevail on a motion for summary judgment, a party must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Id.*; Super. Ct. Civ. R. 56(a). We view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Radbod v. Moghim*, 269 A.3d 1035, 1041 (D.C. 2022); Super. Ct. Civ. R. 56(c).

As to Judge Irving's grant of summary judgment to UCI on the contract claims, appellants argue that the trial court erred by (1) finding that resolution of the contract claims required determining questions of disputed religious doctrine; and (2) after making that finding, failing to apply the fraud or collusion exception to nonetheless permit review of the contract claims. We start with some legal background on the religious abstention doctrine, and then address these arguments in turn.

"The First Amendment's Religion Clauses 'severely circumscribe the role that civil courts may play in the resolution of disputes involving religious organizations.'" *Moon III*, 281 A.3d at 60 (quoting *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 353 (D.C. 2005)). Encapsulated in what has come to be known as the religious abstention doctrine, the Supreme Court has held that civil courts

cannot decide claims that turn on "the interpretation of particular church doctrines" or "the importance of those doctrines to the religion." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969). Neither can courts answer questions regarding contested matters of religious leadership or governance. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 186 (2012) (Religious organizations must have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952))).

But civil courts are of course not barred from "resolving any dispute with religious implications." *Moon III*, 281 A.3d at 61. We can resolve property or contract disputes between religious factions, for example, if we can do so through the application of "neutral principles of law" and "without deciding contested matters of church doctrine, polity, or practice." *Id.* (quoting *Moon I*, 129 A.3d at 250, 252); *Presbyterian Church*, 393 U.S. at 449. In determining whether a claim can be adjudicated via neutral principles of law, "we must look past 'the label placed on the action' and consider 'the actual issues the court has been asked to decide.'" *Moon III*, 281 A.3d at 62 (quoting *Moon I*, 129 A.3d at 249). This approach balances competing First Amendment interests by preserving access to the courts for religious claimants while also preventing inappropriate government entanglement in religion.

*See Jones v. Wolf*, 443 U.S. 595, 606 (1979) (The "neutral-principles approach" does not impede the "free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods.").

The Supreme Court has also suggested that there is a "potential" "fraud or collusion" exception to the religious abstention doctrine. *Moon III*, 281 A.3d at 70 (citing *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976)). Under that exception, the Court reasoned it could be appropriate for courts to decide a facially ecclesiastical dispute when religious actors "act in bad faith for secular purposes." *Milivojevich*, 426 U.S. at 713. But it remains true that as of today, "no decision of [the Supreme Court] has given concrete content to or applied the 'exception,'" the origin of which was "dictum only" from the Supreme Court's prior decision in *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1 (1929). *Milivojevich*, 426 U.S. at 712; *Moon v. Moon*, 833 F. App'x 876, 880 (2d Cir. 2020) (referring to "purported" fraud or collusion exception).

### i.  The contract and quasi-contract claims are nonjusticiable under the religious abstention doctrine.

Appellants' contract-related claims—which for our purposes include the claims for breach of contract, promissory estoppel, and unjust enrichment—are all based on the purported existence of conditions that UCJ had placed on its donations to UCI, and UCI's alleged breach of those conditions.  This included the primary "restriction" that the donated funds "would be used in a manner consistent with the purposes for which [UCI] was established," as those purposes were described in UCI's articles of incorporation before their 2010 amendment.  Those pre-2010 articles described UCI's purpose as "assisting, advising, coordinating, and guiding the activities of Unification Churches" across the globe, a purpose that "was also reflected in correspondence between" UCJ and UCI.  UCJ claims that UCI breached those conditions it placed on its bequests when it made substantial donations to KIF and GPF.

The trial court was correct to hold that determining whether UCI breached these conditions would improperly embroil our courts in the same religious questions we found nonjusticiable in *Moon III*.  To resolve whether UCI's donations to KIF and GPF were a breach of a potential contract with UCJ, the trial court would need to determine the meaning of "the activities of Unification Churches" with some degree of specificity.  *See United House of Prayer for All People v. Therrien*

*Waddell, Inc.*, 112 A.3d 330, 338 (D.C. 2015) (Contracts must be "sufficiently definite" and "provide[] a sufficient basis for determining whether a breach has occurred." (quoting *Rosenthal v. Nat'l Produce Co., Inc.*, 573 A.2d 365, 370 (D.C. 1990))); *Simard v. Resolution Tr. Corp.*, 639 A.2d 540, 552 (D.C. 1994) (promissory estoppel claims require "evidence of a promise"); Restatement (Third) of Restitution and Unjust Enrichment §§ 1-2 (A.L.I. 2011) (unjust enrichment claims require "observable loss" and retention of a benefit "in a manner that the law regards as unjustified"). And here, UCJ and UCI strongly disagree as to what those religious Unification Church "activities" can be, and we cannot resolve that dispute by resorting to any neutral legal principles. We instead would need to opine on core religious questions, which is beyond our bailiwick.

Let's start with the KIF transfer, which involved UCI, under Preston Moon's leadership, moving Parc1 and other assets to KIF pursuant to an agreement that the assets be used in accordance with a more interfaith vision of the Unification Church. For that transfer to be deemed inconsistent with "the activities of the Unification Church" and thus constitute a breach of any conditions that UCJ put on its donations, it would require our courts to determine one of two things (maybe both): that (1) appellants' competing denominational vision for the Unification Church is the sole and true path forward for the religion; and/or (2) only donations approved by Rev. Moon or his valid religious successor—to the exclusion of Preston Moon—

could be considered as supporting the Unification Church.[12] To reach either conclusion would be a "deeply religious judgment" that the trial court rightfully declined to make. *Moon III*, 281 A.3d at 64-65. In *Moon III*, we likewise declined to take sides between these two different "conception[s]" of the Church and refused to hold that anyone was or was not the Church's true leader, let alone hold that the Church had a hierarchical structure such that the leader's judgment would "carry dispositive weight in church disputes." *Id.* at 64, 69 (discussing Preston being named the "fourth Adam" by Rev. Moon and noting that "intrachurch succession disputes fall squarely within the nonjusticiable category" (quoting *Moon v. Moon*, 431 F. Supp. 3d 394, 406 (S.D.N.Y. 2019), *aff'd Moon*, 833 F. App'x 876)).

---

[12] Appellants at times suggest, harkening back to Rev. Moon himself, that there are roughly no bounds on how the true leader of the Unification Church directs UCI's assets. The leader charts the Unification Church's course, and can steer the ship wherever he likes, so that by virtue of advancing his own vision he has per se supported the Church. At other times, they suggest some limits on the true leader's power to steer the religion, so that even if Preston were the true successor to Rev. Moon, he may yet have diverted UCI's funds away from the Unification Church's purposes. It is this unclarity in appellants' position that prompts us to equivocate on whether we would need to draw one or both of the conclusions above in order to find appellants have a viable claim, and ultimately it does not matter because we could not draw either one. At oral argument, appellants' counsel was twice asked pointedly whether they would have had a viable suit against Rev. Moon if he (rather than Preston) had directed UCI to make the KIF donation during his lifetime. Counsel did not provide a direct answer.

The GPF transfers, meanwhile, involved diverting donations that had historically gone to UPF (an organization led by Sean Moon) to GPF (an organization led by Preston Moon) for the purpose of holding "global peace festivals." For our courts to say that transfer did not support "the activities of the Unification Church," we again would need to conclude either or both (1) that Preston is not the true leader of the Unification Church and/or (2) that GPF's peace festivals somehow conflict with, or at least fail to advance, Unification Church practice or theology whereas UPF peace festivals advance the religion. Again, this would require our courts to embroil themselves in disputed theological questions of religious leadership and doctrine, which would be constitutionally improper.

Appellants suggest some ways out of this theological thicket, but none of them is navigable. For one, appellants argue that the trial court wrongfully found that UCI's articles of incorporation were "the only evidence of the potential contract terms," pointing to UCJ's "donative intent" and other correspondence like "solicitation letters and budgets" as containing "contract terms that would permit adjudication of a breach on neutral principles of law."

That misses the abstention problem entirely. Appellants' invocation of "donative intent" is of a piece with the aforementioned contractual "restrictions" on donations. There was deposition testimony and other evidence that UCJ's funds

were donated so that UCI could put them towards "activities under the guidance of the True Parents and international headquarters," "missionary purposes," and UCI's "original purposes." These similarly broad and religion-focused conditions all run into the same First Amendment problems as before. "Original purposes" refers to the same exact articles of incorporation language, and whether the KIF and GPF transfers were made under the "the guidance of the True Parents" likewise gets into disputed questions of theology. "True Parents" refers to Rev. Moon and Hak Ja Han Moon, and Rev. Moon's vision or "guidance" for the Church is very much contested—Preston's interfaith perspective, in his words, was based upon Rev. Moon's own pronouncements about the end of the Church and the beginning of a "family" approach. Neither can we answer what constitutes "international headquarters"—we held in *Moon III* that the question of whether any organization is "truly the authoritative religious entity directing the Unification Church" is a nonjusticiable religious question. 281 A.3d at 62 n.17. We are thus unable to wade into the waters of defining these terms with the kind of specificity necessary to resolve whether a breach of contract occurred. Whether they come packaged as contractual restrictions, donative intent, or Harry Houdini—these arguments still cannot wriggle out of their abstention doctrine shackles.

The correspondence appellants cite similarly harkens back to UCI's articles of incorporation and the disputed religious terms therein. The solicitation letters and

budgets mentioned that UCJ's donated funds would go towards "[b]usiness and other projects which, economically or otherwise, help advance the mission of UCI and the worldwide Unification Church movement." "[A]dvanc[ing] the mission of UCI and the worldwide Unification Church movement" is essentially identical to the language in UCI's original articles, which describes "assisting, advising, coordinating, and guiding the activities of Unification Churches." Appellants offer no reasoning for why these two remarkably similar "conditions" should be treated any differently, so neither can this correspondence provide a religiously neutral path for analyzing appellants' claims.

In addition, appellants argue that because KIF was an entity that "could not have a religious purpose" under Swiss law, the KIF transfer was a violation of the condition that donated assets be put towards religious purposes and remain "restricted to the Unification Church." Granting without delving into their understanding of Swiss law, this argument nevertheless runs into the problem that UCI has a long history of donating substantial sums to secular entities. As we stressed in *Moon III* and have emphasized again here, the First Amendment prohibits us from finding that those historical donations were somehow compliant with the Unification Church doctrine because Rev. Moon approved them, while this later one was not because Preston (rather than Sean or Hak Ja Han) did. *See Moon III*, 281 A.3d at 68-69.

Appellants' last contract-based argument is that "no matter what the donative restrictions were, UCI breached them by irrevocably transferring assets to KIF without knowing or having any mechanism to know or oversee whether KIF used the assets consistent with UCJ's donative intent." But this argument suffers from a fundamental defect: it is not based in any "obligation or duty arising out of [a] contract." *CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc.*, 325 A.3d 1235, 1244-45 (D.C. 2024). Appellants do not point to any contractual obligation requiring UCI to monitor third-party recipients of donated funds to ensure they use those funds as intended.

At bottom, appellants have yet to provide a clear, spelled-out answer as to how a court or jury might parse their contract and quasi-contract claims through neutral principles of law. Pointing us to any and all potential contract conditions in the record does not cure the underlying problem we identified in *Moon III*—which was reiterated by the trial court on remand—that any path of decisionmaking analysis would require deciding actual, disputed questions of religious doctrine or leadership. This necessarily results from the combination of (1) the use of extraordinarily broad, religious language in the purported contract terms and (2) an intrachurch dispute about the meaning of that language. The contract-related claims therefore must fail under the baseline religious abstention doctrine.

ii. Any fraud or collusion exception would not save the contract-related claims.

In their final attempt to rescue the contract and quasi-contract claims,[13] appellants argue that the trial court should have found that a fraud or collusion exception to the religious abstention doctrine actually exists, and then applied it so that their claims could continue to trial. The basis for finding that this case involved "tactical" or "contrived use of religion" amounting to fraud or collusion, appellants contend, is that when coordinating the KIF transfer, UCI acted "in secrecy," did not exercise "oversight" over the KIF transfer, did not follow "corporate norms," and converted "the Church's assets" "to their own use." Appellants also point to Preston

---

[13] We focus our fraud or collusion discussion on the contract-related claims because that is largely how the discussion was teed up before the trial court. UCJ's opposition to UCI's motion for summary judgment regarding the contract-related claims relied most heavily upon the fraud or collusion exception, and the trial court only analyzed the fraud or collusion exception with respect to those claims. To the extent that appellants argue on appeal that the trial court should have found the fraud or collusion exception also applicable to Count II's breach of fiduciary duty claim (which formally survived *Moon III* in that we did not direct summary judgment in favor of Preston Moon and the director defendants on Count II, but rather reversed the trial court's prior grant of summary judgment), our reasoning in this section applies with equal force. As we will explain, appellants cannot invoke the fraud or collusion exception because they have not made a showing—despite many years of discovery—that Preston Moon or the director defendants were bad faith actors with truly secular motives. That forecloses any argument that the religious abstention doctrine should not apply to the KIF and GPF transfers or the amendment of UCI's articles of incorporation, whether framed within appellants' theories of breach of contract or breach of fiduciary duty.

Moon's efforts to replace UCI's board with people who believed in his vision and leadership within the Unification Church, which they decry as a "takeover."

We do not need to reach the question of whether there is in fact a fraud or collusion exception to the abstention doctrine, because assuming for the sake of argument that such an exception exists, appellants' claims would not fit within any viable version of it.[14]

To recap, the potential fraud or collusion exception—which the Supreme Court has explained would have to be quite "narrow" if it is recognized at all—allows for "marginal civil court review" when religious actors act "in bad faith for secular purposes." *Milivojevich*, 426 U.S. at 713; *see also Moon*, 833 F. App'x at 880 (The exception "would apply where a religious entity engaged in a bad faith attempt to conceal a secular act behind a religious smokescreen."). Notably, the fraud or collusion exception was once the "fraud, collusion, or arbitrariness exception"—in *Milivojevich*, the Court jettisoned "arbitrariness," reasoning that whether a religious figure acted arbitrarily would "inherently" involve an inquiry into religious rules or custom, which "is exactly the inquiry that the First

---

[14] For the same reason, we do not reach UCI's contentions that (1) the fraud or collusion exception cannot apply as a threshold matter to claims that do not sound in fraud (i.e., cannot apply to a breach of contract claim); and (2) appellants therefore needed to specifically plead a claim for fraud to avail themselves of the exception.

Amendment prohibits." 426 U.S. at 712-13. The Court thus declined to recognize an exception that "would undermine the general rule." *Id.*; *see also Kaufmann v. Sheehan*, 707 F.2d 355, 358-59 (8th Cir. 1983) (declining to apply exception even where complaint "arguably state[d] a claim for fraud or collusion" because priest's underlying claims "deal only with matters of religion" and not "secular aspects to employment"). This court has been asked once before to apply the fraud or collusion exception, and we declined to do so because it was "likely to be as impossible to apply as the 'arbitrariness' portion of the exception" and there were no "extraordinary circumstances" warranting its application. *Heard v. Johnson*, 810 A.2d 871, 881 (D.C. 2002) (involving a pastor's defamation suit against a former church employer). And even assuming the exception could apply, we noted that it would be unavailing because the plaintiff never pled that the statements he was challenging in his defamation suit had "secular purposes." *Id.* at 881-82 (quoting *Milivojevich*, 426 U.S. at 713).

Here, the "facts" that appellants cite in support of the fraud or collusion exception do not support a conclusion that the KIF or GPF transfers were secular acts performed under religious pretext such that the exception could apply. Appellants' point that the KIF transfer involved converting Church assets "to [UCI's] own use," which they apparently mean as "UCI's secular use," is unsupported and conclusory. And even if we assume that UCI acted secretively and

contrary to corporate norms,[15] that is entirely unsurprising given the undisputed religious schism that had arisen within the Unification Church. It is no mystery why one faction of a religious schism would want to surreptitiously funnel money to its own religious causes rather than announcing those maneuvers to opposing factions—once the other side finds out, you are bound for protracted litigation (as ultimately occurred here). That secrecy is simply no evidence at all that Preston— who has at least a plausible claim to being Rev. Moon's rightful successor, and perhaps to messianic status, under any view of the evidence—or his followers knew that Preston was a fraud, as appellants would need to show to invoke any fraud or collusion exception. Appellants simply have no meaningful evidence on that point sufficient to gin up a genuine issue of material fact that would ward off summary judgment against them. The fraud and collusion that appellants would have our courts adjudicate via an exception to the religious abstention doctrine depends entirely on our willingness to jump into the ecclesiastical deep end and resolve religious disputes, a step we have already explained we are precluded from taking. *Moon III*, 281 A.3d at 70.

---

[15] UCI does not contest appellants' characterizations that (1) appellants were not made aware of the KIF transfer until discovery in this litigation; and (2) UCI did not conduct a review or appraisal of the assets before making the transfer.

The overwhelming weight of the evidence in this case indicates that the KIF and GPF transfers and the efforts to facilitate them were motivated by religious intentions, not "secular purposes." *Heard*, 810 A.2d at 882. Preston organized the KIF transfer pursuant to an agreement steeped in religious language—this agreement, which mirrored UCI's amended articles of incorporation, included purposes such as the promotion of "interdenominational, interreligious, and international unification of world Christianity and all other religions," and the advancement of "the understanding and teaching of the theology and principles of the Unification Movement." Plus, there was evidence that the Parc1 property was transferred to KIF so as to improve the development's economic prospects, which Preston Moon and one of the directors believed would help fulfill Rev. Moon's "lifelong dream" of developing the Parc1 property for the Church. And as for Preston Moon's efforts to replace UCI's board members, it is undisputed that Preston Moon did this to ensure that people who shared his view of the Unification Church as a decentralized and interfaith movement had a stronghold. There is no meaningful countervailing evidence aside from appellants' aspersions that Preston is an interloper, not the true leader, and to agree with them about that would require us to walk blindfolded back into the ecclesiastical fire.

Appellants' own statements and proffered evidence in this case further cut against finding that Preston's actions or the motives behind them were dishonest or

a mere "smokescreen" for self-dealing. *Moon*, 833 F. App'x at 880. Appellants acknowledged in one of their proposed findings of fact that "as of 1998, Preston Moon believed he was leading the Unification Church movement," which was a belief shared by all of UCI's new directors, all of whom grew up in the Church and several of whom were born into families central to its founding. Furthermore, appellants' own expert testified in a deposition that the interfaith and denominational factions within the Church are "utterly convinced that their way forward is the path the Unification tradition should follow." This evidence further illustrates our inability to "disentangle" and isolate any secular fraud or collusion from UCI's actions, which were done under the auspices of Preston Moon's claim to "messianic status" and his leadership of the Church's interfaith faction. *Moon III*, 281 A.3d at 70; *see generally id.* at 50, 53-59 (describing an actual "religious schism" that began "[i]n the final years of Rev. Moon's life" before this litigation began). This situation cannot amount to "extraordinary circumstances" of bad-faith, secular activity that might warrant application of the fraud or collusion exception. *Heard*, 810 A.2d at 881. If it did, the exception would swallow the abstention doctrine whole.

Let us elaborate on why appellants' view of the fraud or collusion exception would obliterate the abstention doctrine, rendering their view as a non-viable candidate for any potentially "narrow" exception that the Supreme Court has suggested may exist. Recall that appellants' claim that the KIF or GPF transfers

were actually secular runs into UCI's long history of making Rev. Moon-approved donations to secular entities (e.g., a general-purpose newspaper, a ballet company, a university, a martial arts organization, and a firearms manufacturer). To determine that these prior donations were religious in nature but the KIF and GPF transfers were not is an exercise that we cannot do under the baseline religious abstention doctrine. As we noted in *Moon III*, this would require us to determine both "that the Unification Church is a hierarchical organization" and that Preston Moon was not "the true leader of the religion" at the time he organized the KIF and GPF transfers. *Id.* at 69.

Appellants' appeal to the fraud or collusion exception runs right into the exact same problem. Preston has only fraudulently donated UCI's assets if he is not the true leader of the Unification Church *and* he knows it. We cannot say the first thing without running afoul of the abstention doctrine, as we made clear in *Moon III*, and if bare allegations of fraud or collusion could get us around that, then the courts would be thrust right back into resolving core theological disputes about religious doctrine, hierarchy, and succession. "No thanks" to that—that runs afoul of the abstention doctrine's central animating principles. And it is well established that we cannot apply any fraud or collusion exception in a way that violates the existing Supreme Court precedent on religious abstention. *See Milivojevich*, 426 U.S. at 713; *Heard*, 810 A.2d at 881; *Kaufmann*, 707 F.2d at 358-59.

The trial court properly declined to apply the fraud or collusion exception to the religious abstention doctrine when it granted summary judgment to UCI on the contract claims.

*E. Appellants have not been denied access to a legal forum based on their religion.*

Appellants further posit for the first time on appeal that the "discriminatory" application of the religious abstention doctrine in this case has "set a dangerous precedent by closing the doors of the courts to religious organizations" and "violate[d]" their "religious freedom."[16]   But appellants' only evidence of discrimination is the fact that the trial court applied the Supreme Court's religious abstention doctrine, which itself reflects and incorporates concerns about religious claimants' access to the courts. *See Jones*, 443 U.S. at 606 (The "neutral-principles approach" does not impede the "free exercise of religion, any more than do other

---

[16] We take appellees' point that appellants appear to have forfeited this argument. Appellants did not raise an access-to-courts argument based on the Free Exercise Clause in either *Moon III* or post-remand when religious abstention was being litigated. *See Rayner v. Yale Steam Laundry Condo. Ass'n*, 289 A.3d 387, 399 n.31 (D.C. 2023) (declining to address argument because it was "not raised in the trial court"); *see also G.W. v. United States*, 323 A.3d 425, 433 (D.C. 2024) (Appellant could not "relitigate in a second direct appeal issues this court addressed on the merits, or could have addressed on the merits had they not been forfeited, in a first direct appeal."). Regardless, appellants' argument that they have been denied access to the courts due to their religion is a specious one, so we tackle it, albeit briefly, on its own terms.

neutral provisions of state law."). This argument also conflates appellants' *status* as religious claimants with appellants' claims, which involve religious *questions*—the religious abstention doctrine applies regardless of who the parties are, focusing on "the actual issues the court has been asked to decide." *Moon III*, 281 A.3d at 62 (quoting *Moon I*, 129 A.3d at 249). We must reject appellants' argument that the Free Exercise Clause required the availability of a trial and eventual remedy for their claims, which would be tantamount to creating a novel end-run around the well-established religious abstention doctrine.

*F. The trial court did not abuse its discretion in denying appellants' efforts to reopen discovery.*

We now turn to appellants' final argument on appeal. After *Moon III*, appellants asked the trial court to reopen discovery—complete with an evidentiary hearing and a chance to belatedly designate an expert—targeted at Preston Moon's relationship with KIF (specifically as to post-discovery comments Preston made about the Parc1 development) and the fraud or collusion exception generally. The proposed discovery would have involved several days' worth of depositions as well as multiple sets of interrogatories and document requests.

The trial court denied their motion after finding that appellants had not made the requisite showings of "good cause" or "excusable neglect." Super. Ct. Civ.

R. 6(b)(1)(B), 16(b)(5)(E), 16(b)(7)(A). The trial court reasoned that the new discovery, involving significant "additional time and expense," would not provide meaningfully new or relevant evidence for appellants' claims. The trial court also specifically rejected appellants' claim that more fact finding on the fraud or collusion exception issue was warranted—since the early stages of this litigation, appellants "were on ample notice that the First Amendment's religious abstention doctrine posed a significant challenge to prosecution of their case," precluding them from reopening discovery on those issues at this "belated" point in the case (five years after discovery's close). As for the belated expert designation, the trial court found the preliminary expert report unhelpful to appellants' cause, since it simply "reiterat[es] the extensive factual record" and "draw[s] generic inferences therefrom," which are tasks that the court or jury could "undertake on their own." The trial court also faulted appellants for not fully complying with Super. Ct. Civ. R. 16(b)(7)(A), which requires movants seeking to reopen discovery to provide the court with, among other things, "the date or dates within which all further discovery must be completed."

Appellants now argue on appeal that the trial court abused its discretion in declining to reopen discovery and rejecting its subsidiary requests for an evidentiary hearing and to belatedly designate a fraud or collusion expert. First, they argue—in just two sentences—that there was excusable neglect here because Preston's recent

statements on Parc1 were made after the close of discovery and the fraud or collusion exception issue "only became ripe after *Moon III*." Second, they posit that the lack of new discovery and an evidentiary hearing was part of the trial court's "error" in "failing to decide whether the [fraud or collusion exception] exists," which they argue violated our *Moon III* remand instructions.

Discovery rulings are generally reviewed for abuse of discretion. *Allen v. Yates*, 870 A.2d 39, 50 (D.C. 2005). "It is a rare circumstance where we find an abuse of discretion in the context of discovery disputes because we are appropriately reluctant to substitute our judgment for that of the trial court." *Featherson v. Educ. Diagnostic Inst., Inc.*, 933 A.2d 335, 338 (D.C. 2007). Where a party moves to reopen discovery after expiration of the deadlines set forth in a pretrial scheduling order, the party not only must make "the required showing of good cause for modification of the court's scheduling order," but also must "satisfy the trial court that [the party's] failure to act in timely fashion was due to excusable neglect." *Dada v. Children's Nat'l Med. Ctr.*, 715 A.2d 904, 908 (D.C. 1998); *see also* Super. Ct. Civ. R. 6(b)(1)(B) (requiring party seeking extension of time to act after expiration thereof to show good cause and excusable neglect); Super. Ct. Civ. R. 16(b)(7)(A) ("The scheduling order may not be modified except by leave of court on a showing of good cause."); Super. Ct. Civ. R. 16(b)(5)(E) (After the close of discovery, "no deposition or other discovery may be had, nor motion relating to discovery filed,

except by leave of court on a showing of good cause."). "Excusable neglect" can be found upon considering factors like the length of delay, the reason for delay, whether the movant acted in good faith, and the danger of prejudice to the nonmoving party. *See In re Estate of Yates*, 988 A.2d 466, 468 (D.C. 2010) (interpreting "excusable neglect" within neighboring Rule 6(b)(2)). "Good cause" similarly involves a multitude of factors, including "whether allowing the evidence would incurably surprise or prejudice the opposite party," "the impact of allowing the proposed testimony [or other discovery] on the orderliness and efficiency of the trial," and whether the new discovery would aid the "completeness of information before the court or jury." *Dada*, 715 A.2d at 909-10 & n.7.

As to their first argument, appellants do not meaningfully challenge the trial court's analysis under the above factors, which is fatal to their efforts. Appellants' opening brief does not at all explain how they met the requirements of good cause (which they had the burden of demonstrating) or Super. Ct. Civ. R. 16(b)(7)(A) (which required them to submit a sufficiently detailed discovery plan). And even if Preston Moon's late-breaking comments about Parc1 provided a good "reason" for part of appellants' delay in requesting to reopen discovery under the excusable neglect analysis, their argument does not address the trial court's core concerns with the cost of the proposed discovery, the likelihood that it would not yield any relevant evidence, the fact that there had already been years of discovery on religious

abstention, and the length of time that had passed since the close of discovery. With most of the relevant factors weighing against appellants—and with appellants failing to contest that the trial court's balancing should have been any different—we conclude that this is not one of the "rare circumstance[s]" where the trial court abused its discretion. *Featherson*, 933 A.2d at 338.

As to their second argument that the trial court failed to follow our remand instructions and thus hampered appellants' ability to make a fraud or collusion argument, appellants misread *Moon III*. In *Moon III*, we noted that the self-dealing theory "may yet have some legs, provided there is evidence to support it," the contract-related claims "remain live in the trial court," and "the trial court may consider [the fraud or collusion exception] on remand if appropriate." 281 A.3d at 60 n.15, 70-71. In no way did we direct the trial court to reopen discovery for further record development regarding the fraud or collusion exception. Appellants have in fact spent nearly a decade litigating the issue of religious abstention in this case, giving them ample opportunity to discover facts in support of their overarching argument that the disputes in this case are sufficiently secular to adjudicate. *See Moon I*, 129 A.3d at 249 (explaining that religious abstention issue required "further evidentiary presentation"). All things considered, appellants offer no basis to conclude that the trial court abused its discretion in denying its various requests to extend discovery. The trial court acted well within its discretion to put an end to this

decade-old case rather than breathing new life into it on its deathbed years after appellants could have gone after the discovery they now belatedly seek.

## IV. Conclusion

For the foregoing reasons, we affirm.

*So ordered.*